**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel* [PLAINTIFF UNDER SEAL]<br><br>        Plaintiffs,<br><br>        v.<br><br>[DEFENDANTS UNDER SEAL]<br><br>        Defendants. | **RELATOR'S COMPLAINT PURSUANT TO THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§3729 *ET SEQ.***<br><br>**FILED UNDER SEAL**<br><br>**DO NOT PLACE ON PACER**<br><br>CIVIL ACTION NO. _____<br><br>**JURY TRIAL DEMANDED** |

**RELATOR'S COMPLAINT PURSUANT TO**
**THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§3729 *ET SEQ.***

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel* JULIO E. HERNANDEZ<br><br>        Plaintiffs,<br><br>    v.<br><br>BAE SYSTEMS SOUTHEAST SHIPYARDS MAYPORT LLC; BAE SYSTEMS SOUTHEAST SHIPYARDS AMHC INC.; BAE SYSTEMS, INC.; EARL INDUSTRIES, L.L.C.; NORTH FLORIDA SHIPYARDS, INC.; QED SYSTEMS, INC.; XCHANGING INC.; W.W. GRAINGER, INC.,<br><br>        Defendants. | **RELATOR'S COMPLAINT PURSUANT TO THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§3729 *ET SEQ.***<br><br>**<u>FILED UNDER SEAL</u>**<br><br>**<u>DO NOT PLACE ON PACER</u>**<br><br>CIVIL ACTION NO. _____<br><br>**JURY TRIAL DEMANDED** |

**RELATOR'S COMPLAINT PURSUANT TO**
**<u>THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§3729 *ET SEQ.*</u>**

1.      Relator Julio E. Hernandez (referred to herein as "Relator"), on behalf of the United States of America, brings this action against BAE Systems Southeast Shipyards Mayport LLC; BAE Systems Southeast Shipyards AMHC Inc.; BAE Systems, Inc.; Earl Industries, L.L.C.; North Florida Shipyards, Inc.; QED Systems, Inc.; Xchanging Inc.; and W.W. Grainger, Inc. (collectively, "Defendants"), for violations of the Federal False Claims Act ("FCA"), 31 U.S.C. §§3729 *et seq.*, to recover all damages, civil penalties and other recoveries provided for under the FCA.

**I.      THE PARTIES**

2.      Defendant BAE Systems Southeast Shipyards Mayport LLC, (hereinafter "BAE Mayport") is a Delaware limited liability company and wholly-owned subsidiary of Defendant BAE Systems Southeast Shipyards AMHC Inc., a Florida corporation.   During all periods

2

Relator worked for BAE Mayport, and continuing to the present day, BAE Mayport served as the prime contractor on a Multi-Ship Multi-Option ("MSMO") contract with the United States Navy to repair and maintain cruisers and destroyers at the Mayport Naval Station in Mayport, Florida.

3.      Defendant BAE Systems Southeast Shipyards, AMHC, Inc. (hereafter "BAE Jacksonville" or "BAEJ"), is a Florida corporation and owner of BAE Mayport.  In addition to its naval contracting operations through BAE Mayport, BAE Systems operates a commercial dry-dock and ship repair facility in Jacksonville, Florida.

4.      Defendant BAE Systems, Inc., (hereafter "BAE Systems") is the overall corporate parent of both BAE Mayport and BAE Jacksonville.  BAE Systems is a Delaware Corporation with a principal place of business in Arlington, Virginia.

5.      Defendant Earl Industries, L.L.C., (hereafter "Earl") is a Virginia limited liability company with a principal place of business in Portsmouth, Virginia.  During the periods relevant to this complaint, Earl has worked with BAE Mayport as a subcontractor on BAE Mayport's MSMO contract with the U.S. Navy.  In August of 2012, the Ship Repair and Coatings Division of Earl Industries—the division that subcontracted with BAE Mayport—was acquired by General Dynamics Corporation, a Delaware Corporation with a principal place of business in Falls Church, Virginia.

6.      Defendant North Florida Shipyards, Inc. (hereafter "North Florida Shipyards") is a Florida corporation with a principal place of business in Jacksonville, Florida.  During the periods relevant to this complaint, North Florida Shipyards has worked with BAE Mayport as a subcontractor on BAE Mayport's MSMO contract with the U.S. Navy.

7.      Defendant QED Systems, Inc. (hereafter "QED") is a Virginia corporation with its principal place of business in Virginia Beach, Virginia.  During the periods relevant to this

complaint, QED has worked with BAE Mayport as a subcontractor on BAE Mayport's MSMO contract with the U.S. Navy.

8.      Defendant Xchanging, Inc. ("Xchanging"), is a Delaware corporation and subsidiary of the London-based procurement services company Xchanging PLC.  At all times relevant to this complaint, Xchanging has provided procurement services to BAE Systems and its subsidiaries, including BAE Mayport and BAE Jacksonville.

9.      Defendant W.W. Grainger, Inc. ("Grainger"), is an Illinois Corporation headquartered in Lake Forest, Illinois.  During periods relevant to this Complaint, Defendants Xchanging and BAE Systems selected Grainger to be the primary indirect materials supplier for BAE Systems and its subsidiaries.

10.      The United States is a plaintiff to this action.  The United States brings this action on behalf of the Department of the Navy, a department within the United States Department of Defense.  At all times relevant to this complaint, the Navy's MSMO contract with BAE Mayport was administered and overseen by a Navy organization called the Southeast Regional Maintenance Center ("SERMC").

11.      Relator is a former employee of Defendant BAE Mayport and has standing to bring this action pursuant to 31 U.S.C. §§3730(b)(1) and 3730(e)(4).  Relator's Complaint is not based on any prior disclosures of the allegations or transactions discussed herein in any criminal, civil, or administrative hearing or lawsuit. Relator has previously disclosed these allegations to the Department of Defense, Office of Inspector General ("DoD OIG"), and is an original source for such allegations, as defined by 31 U.S.C. §3730(e)(4).

## II.      SUMMARY OF THE ACTION

12.      Relator, on behalf of the United States, brings this case to challenge Defendants' various, interrelated schemes to defraud the United States Navy.

13.      At the center of these interrelated schemes is BAE Mayport, Relator's former employer and the Navy's prime contractor on its multi-ship multi-option ("MSMO") ship repair contract for the Mayport Naval Station.

14.      In its role as the Navy's prime contractor, BAE Mayport has engaged and continues to engage in a conspiracy with its major subcontractors—Earl Industries, Inc., North Florida Shipyards, Inc., and QED Systems, Inc.—to defraud the United States by rigging bids on ship repair work for the Navy.

15.      During the same period, BAE Mayport has engaged in a separate scheme to defraud the United States by overcharging the United States for parts, materials, and indirect costs under BAE Mayport's MSMO contract.

16.      BAE Mayport's scheme to overcharge the United States for parts, materials, and indirect costs is, in turn, part of a broader scheme by BAE Mayport's corporate parent, BAE Systems, together with Xchanging and Grainger, to overcharge the United States for parts, materials, and indirect costs.  As part of this scheme, Xchanging has paid kickbacks to BAE in return for BAE using Xchanging's recommended materials supplier.

17.      In May and June of 2012, Relator arranged for a BAE internal audit of the purchasing system at BAE Mayport.  This audit confirmed that the procurement system did not comply with BAE Mayport's contractual and legal obligations, thus facilitating Defendants' fraudulent schemes.  Rather than take any corrective action, BAE Mayport retaliated against Relator and ultimately terminated him from his job in early 2013.

## III.    JURISDICTION AND VENUE

18.    Jurisdiction is founded upon the FCA, 31 U.S.C. §§3729, *et seq*., specifically 31 U.S.C. §3732(a), and also 28 U.S.C. §§1331 and 1345.

19.    Venue in the Middle District of Florida is appropriate under 31 U.S.C. §3732(a) in that, at all times material to this civil action, one or more of the Defendants transacted business in the Middle District of Florida, or submitted or caused the submission of false claims in the Middle District of Florida.

## IV.    APPLICABLE LAW

### A.    THE FALSE CLAIMS ACT

20.    The FCA, 31 U.S.C. §§3729-3733, provides, *inter alia*, that any person who (1) "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," or (2) "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," is liable to the United States for a civil monetary penalty plus treble damages.  31 U.S.C. §3729(a)(1)(A)-(B).

21.    The FCA further provides, under 31 U.S.C. §3729(a)(1)(G), that any person who "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money to the Government" is liable to the United States for a civil monetary penalty plus treble damages.

22.    The terms "knowing" and "knowingly" are defined to mean "that a person, with respect to information - (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information."   31 U.S.C. §3729(b)(1)(A)(i)-(iii).   Proof of specific intent to defraud is not required.  31 U.S.C. §3729(b)(1)(B).

23.     The term "material" means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  31 U.S.C. §3729(b)(4).

24.     Pursuant to 31 U.S.C. §3729(b)(2)(A)(i)-(ii), the term "claim" means:

> any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that - (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government - (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

25.     In addition to creating liability for those who submit or cause the submission of false claims, 31 U.S.C. §3729(a)(1)(C) creates liability for any person who "conspires to commit violations" of other sections of the FCA, which includes conspiracies to present and obtain payment for false and fraudulent claims.

## B.     FEDERAL ACQUISITION REGULATIONS

26.     The Federal Acquisition Regulations ("FARs") are promulgated by the Federal Government to establish "uniform policies and procedures for acquisition by all executive agencies."  48 C.F.R. §1.101.

27.     The driving principle behind the FARs is to "deliver on a timely basis the best value product or service to the customer [*i.e.* government agency],while maintaining the public's trust and fulfilling public policy objectives."  48 C.F.R. §1.102(a).

28.     In addition to providing general guidance to federal contracting officers and establishing prohibited practices for government contractors, the FARs also include a substantial number of default clauses and provisions for use in contracts between a federal agency and outside contractor.  48 C.F.R. §§52.100, *et seq*.

29.     The federal contracting officer responsible for a particular contract has some discretion over which clauses and provisions to include, but is expressly forbidden from modifying provisions and clauses except where the FARs authorize such modification.   48 C.F.R. §52.104(a).

30.     As the successful bidder on the Mayport Naval Station MSMO contract, BAE Mayport entered into a contract with the Navy's Naval Sea Systems Command ("NAVSEA") that incorporated many of the provisions and clauses set forth in the FARs, as well as several supplemental terms and provisions set forth in the Defense Acquisition Regulations ("DFARs"), 48 C.F.R. §§201.105, *et seq*.

## V.      BACKGROUND FACTS

### A.      Mayport Naval Station

31.     Mayport Naval Station is a naval base located in Mayport, Florida, approximately 20 miles from downtown Jacksonville.

32.     Among its various roles, Mayport Naval Station serves as the homeport to four guided-missile cruisers—USS *Philippine Sea*, USS *Gettysburg*, USS *Hue City*, and USS *Vicksburg*—as well as four guided-missile destroyers—USS *Carney*, USS *The Sullivans*, USS *Roosevelt,* and USS *Farragut*.

33.     These cruisers and destroyers spend the majority of their time deployed away from their homeport.

34.     When one of these ships returns to Mayport Naval Station, one of the Navy's top priorities is making sure that necessary repairs, maintenance, and upgrades are performed.  Such repairs and maintenance range from the mundane—*e.g.*, fixing a clogged toilet—to complicated structural repairs that require putting the ship in dry-dock.

35.     Rather than performing these repairs and maintenance itself, the Navy contracts the work to a private contractor, pursuant to a MSMO contract covering all eight ships, plus visiting cruisers and destroyers.

36.     Other ships home-ported at Mayport Naval Station, including several frigates and coastal patrol ships, are not included in the MSMO contract.

37.     From the fall of 2010 through the present, the MSMO prime contractor at Mayport Naval Station has been Defendant BAE Mayport.

**B.      The MSMO Contract and BAE Mayport's Teaming Agreement with the Subcontractor Defendants**

38.     In 2009, the Navy's Naval Sea Systems Command ("NAVSEA") issued Solicitation Number N00024-09-R4412, soliciting bids for the Mayport MSMO contract.

39.     This solicitation prompted Atlantic Marine Mayport LLC—the predecessor of BAE Mayport[1]—to enter into negotiations with Earl, North Florida Shipyards, and QED, regarding cooperation between those four companies.

40.     These four companies were all experienced naval contractors with an established presence in the Jacksonville area.

41.     On October 5, 2009, the four companies entered into a "Teaming Agreement" with respect to both bidding on the MSMO contract and the division of work between them in the event of a successful bid.

42.     Under the terms of the Teaming Agreement, Atlantic Marine Mayport and North Florida Systems would both submit bids on Solicitation Number N00024-09-R4412, while Earl and QED would not.

---

[1]      BAE purchased Atlantic Marine Mayport and changed its name to BAE Systems Southeast Shipyards Mayport LLC in or around July of 2010.

43.     The agreement also called for Atlantic Marine and North Florida Shipyards to each name the other three entities as critical subcontractors in their respective bids.

44.     In the event that either Atlantic Marine or North Florida Shipyards was awarded the prime MSMO contract, the Teaming Agreement established a "work split objective" for production work, divided as follows:

    a.   <u>Atlantic Marine</u> – 30% of total contract value, exclusive of specification writing and drydock work;

    b.   <u>North Florida Shipyards</u> – 20% of total contract value, exclusive of specification writing and drydock work;

    c.   <u>Earl Industries</u> – 40% of total contract value, exclusive of specification writing and drydock work;

    d.   <u>QED</u> – 10% of total contract value, excluding drydock work, plus 100% of specification writing.

45.     Under the Teaming Agreement, the prime contractor had the power to vary the above percentages in certain circumstances, including when the designated party is unable to timely, efficiently, or properly perform the work required.

46.     On September 13, 2010, NAVSEA awarded the Mayport MSMO contract to BAE Mayport—the successor entity to Atlantic Marine Mayport.

47.     Under this MSMO contract, BAE Mayport was responsible for accomplishing "non-scheduled repair and alternation requirements" for homeported and visiting cruisers and destroyers at Mayport Naval Station.

48.     In return, BAE was to be compensated on a cost-plus-fee basis.  Specifically, BAE was to be reimbursed its allowable costs and was also eligible to receive an "award fee"—

based on management and technical performance—and an "incentive fee"—based on cost and scheduling performance.

49.    This contract also incorporated, either explicitly or by reference, a number of standard contract provisions from the FARs.

50.    Pursuant to 48 C.F.R. §52.216-7 (Dec. 2002),[2] the contract established that the government would make payments as requested as BAE's work progressed, but not "more often than once every 2 weeks, in amounts determined to be allowable by the Contracting Officer in accordance with Federal Acquisition Regulation subpart 31.2 in effect on the date of this contract and the terms of this contract."

51.    As of the date BAE and the government entered into the MSMO contract, FAR Subpart 31.2 provided that an allowable cost must be reasonable, and that "[a] cost is reasonable if, in its nature and amount, it does not exceed that which would be incurred by a prudent person in the conduct of competitive business." 48 C.F.R. §31.201-3(a) (Sept. 2010).

52.    Additionally, FAR Subpart 31.2 provides that when a contractor's accounting practices are inconsistent with the FARs' requirements, "costs resulting from such inconsistent practices in excess of the amount that would have resulted from using practices consistent with this subpart are unallowable." 48 C.F.R. §31.201-2(c) (Sept. 2010).

53.    Pursuant to 48 C.F.R. §52.215-10 (Oct. 1997), if BAE Mayport or any of its subcontractors or prospective subcontractors submitted data of any description that was inaccurate and resulted in a significant increase in the amount of reimbursement, then the cost reimbursed by the government was to be reduced accordingly.

---

[2]    Because the FARs are subject to frequent updates, the MSMO contract for Mayport Naval Station identifies the specific version of each FAR provision referenced and incorporated by month and year.

54.     Pursuant to 48 C.F.R. §252.215-7002(a)(2), (b) (Dec. 2006), BAE Mayport was required to "establish, maintain, and comply with an accepted estimating system" that produces "verifiable, supportable, and documented cost estimates that are an acceptable basis for negotiation of fair and reasonable prices."

55.     Pursuant to 48 C.F.R. §52.244-5(a) (Dec. 1996), BAE Mayport was required to "select contractors (including suppliers) on a competitive basis to the maximum practical extent consistent with the objectives and requirements of the contract."

56.     In violation of these contract requirements, BAE Mayport has engaged in an ongoing conspiracy and scheme to defraud the United States by working with the subcontractor defendants to rig bids and inflate costs under its MSMO contract.

C.     **Relator's Work Experience at BAE Mayport and his Communications with Federal Investigators**

57.     Prior to working for BAE Mayport, Relator had worked for BAE Land & Armaments division in Fairfield, Ohio.

58.     A major part of Relator's job in Fairfield was developing an approved purchasing system, which permits a contractor to operate with more limited government oversight.

59.     During a meeting in Washington D.C. in August 2011, Relator met Brad Moyer, who was then serving as BAE's Director of Supply Chain II for Ship Repair Corporate in Norfolk, Virginia.

60.     During the meeting, Mr. Moyer indicated that he could use an employee with Relator's experience with FARs and purchasing systems to assist the company's newly acquired ship repair facility in Mayport obtain purchasing system approval from the Defense Contract Management Agency.

61.     After several weeks of back and forth negotiations and an interview in Mayport, Relator was hired as a Purchasing Manager with responsibility for: (1) segregating the Mayport procurement operations from the commercial procurement operations at BAE Jacksonville; (2) hiring and training Mayport procurement staff; (3) integrating procurement and warehouse operations at Mayport; (4) integrating material and subcontract estimating with Procurement operations; and (5) developing and implementing a procurement manual.

62.     Despite the promises made to Relator by BAE and Brad Moyer's stated interest in developing an approved purchasing system, Relator was hamstrung in his efforts from the moment he arrived at BAE Mayport.

63.     As detailed in following sections of this complaint, Relator found that BAE Mayport's purchasing system had no meaningful safeguards or record-keeping requirements to ensure that the costs being passed along to the United States were reasonable.

64.     Additionally, Relator found that BAE Mayport—as the successor to Atlantic Marine Mayport—was using its Teaming Agreement with Earl, North Florida Shipyards, and QED as cover for rigging bids and submitting inflated cost estimates to the United States.

65.     During the course of his employment, Relator repeatedly raised and attempted to remedy the improprieties he uncovered in this purchasing system.  However, every attempt by Relator to bring this purchasing system into compliance with federal law was stymied and undone by his superiors.  Ultimately, Relator was terminated in retaliation for these efforts.

66.     After approximately one year of trying to address these issues internally, Relator submitted a Defense Hotline Complaint Form to the Department of Defense Office of the Inspector General ("DoD OIG") on March 28, 2013, setting forth BAE Mayport's fraudulent schemes to overcharge the United States under its MSMO contract.

67.     Since that time, Relator has been in repeated contact with DoD OIG, disclosed significant amounts of information, and turned over significant numbers of documents. Accordingly, Relator constitutes an original source for the claims in this complaint pursuant to 31 U.S.C. §3730(e)(4).

## VI.     DEFENDANTS' SCHEMES TO DEFRAUD THE UNITED STATES

### A.     BAE Mayport Knowingly Refuses to Establish an Acceptable Estimating System

#### i.     In General

68.     Under its MSMO contract, BAE Mayport was required to "establish, maintain, and comply with an accepted estimating system" that produces "verifiable, supportable, and documented cost estimates that are an acceptable basis for negotiation of fair and reasonable prices." 48 C.F.R. §252.215-7002(a)(2), (b) (Dec. 2006).

69.     At no point during Relator's time at BAE Mayport did the company come close to complying with this requirement.

70.     When he arrived in late 2011, Relator found that BAE Mayport's procurement staff was rubber-stamping requisition requests created in the SREP System without performing any independent price analysis.

71.     The SREP System—short for Ship Repair Electronic Procurement—was BAE Mayport's master database for creating and tracking requisitions, purchase orders, invoices, and supporting documentation and data.

72.     The lifecycle of an SREP entry for any particular task would typically begin with a requisition, which provided notice to the procurement department that particular materials and/or labor needed to be ordered.

14

73.     Various types of BAE employees were able to access SREP to create requisitions, including employees in the purchasing and crafts departments, as well as estimators, ship superintendents, and warehouse personnel.

74.     Each requisition would include a request for both labor and materials, as appropriate.

75.     In most instances, the requisitions would specify a particular subcontractor—*e.g.*, requesting 20 hours of labor from Earl—without stating any basis for awarding the work to that contractor and without first determining the cost to perform the work internally.

76.     In a well-organized purchasing system, the generation of a requisition will prompt a review by one or more employees within the Purchasing Department.

77.     If the requisition is for services that can be provided internally, by the prime contractor, then one employee, the estimator, will independently estimate the cost of providing that service.  At the same time, a second individual, the subcontract manager, will solicit quotes from suppliers to determine the cost of subcontracting for the labor.  The estimator and subcontract manager will then compare their respective numbers to determine the most cost effective way to fill the requisition.  This is known as the "make or buy" process.

78.     If the labor described in the requisition is not something that the contractor can provide internally, then the subcontract negotiator will still solicit quotes and compare prices, but without any meaningful involvement by the estimator.

79.     Unlike the model described above, the procurement agents at BAE Mayport would typically generate purchase orders that fulfilled the requisitions exactly as written, without making any determination of whether the labor or materials could be obtained at lower cost from another source.

80.     Additionally, there was no separation between the internal estimators and subcontract negotiators. When Relator arrived at BAE Mayport, he found that Estimators—who were not even within the purchasing department—were performing both roles simultaneously, leaving the subcontract negotiators and buyers within the purchasing department with nothing more than the administrative role of converting requisitions into purchase orders.  Specifically, the Estimators, or sometimes craft workers or project managers with SREP access, would make the decision about whether to fill the requisition internally or to subcontract it, as well the decision of which subcontractor to use.

81.     This meant that the same individuals responsible for soliciting bids from subcontractors were responsible for determining whether and at what price BAE Mayport could perform the work internally, which created opportunities for BAE Mayport to inflate its internal estimates based on the estimators' knowledge of what subcontractors were charging for the same work.

### ii.     Relator Attempts to Fix Problems with Purchasing System, But is Prevented from Doing So by His Managers at BAE Mayport.

82.     When Relator began working at BAE Mayport, he understood his primary job responsibility to be restructuring the BAE Mayport purchasing system in order to obtain approval for that system by the Defense Contract Management Agency.  Such approval would allow BAE Mayport to operate as MSMO prime contractor with less direct oversight from the government.

83.     From the very beginning, however, Relator's superiors at the Mayport facility made clear that they were hostile to his efforts and had no interest in submitting their purchasing systems to proper price controls or meaningful competition.

84.     On February 15, 2012, Relator was invited by BAE Mayport's Director of Contracts, Catherine Palmer, to attend one of her weekly meetings with the Administrative Contracting Office (ACO) for the Navy's Southeast Regional Maintenance Center ("SERMC"), Jose Marin.

85.     At this meeting, Ms. Palmer and Relator explained to Officer Marin that BAE Mayport's common practice was to award contract work on a "single source" basis rather than competing it, though they did not necessarily endorse that practice.

86.     Officer Marin expressed his displeasure at this, and was particularly irritated to learn that BAE Mayport had been single-sourcing its Expanded Process Control Procedure (EPCP) drafting work to a company called Gibbs & Cox, rather than competing it.

87.     As a result of this meeting, Ms. Palmer began soliciting quotes from other EPCP subcontractors, rather than simply sending all such work to Gibbs & Cox.

88.     Later, however, at a BAE Progress Analysis Meeting, Deputy Program Manager Pete Cavasino explained to the managers in attendance that Ms. Palmer had begun to compete some of the EPCP work, and that she had met with Officer Marin and Relator on this issue.

89.     Upon hearing this, Vince Stammetti, the Director and General Manager for BAE Jacksonville and BAE Mayport, began cursing, saying that "no dumb f[expletive]ing Hispanic who does not know s[expletive]" would tell him how to run his business.  Mr. Stammetti also called Ms. Palmer a "f[expletive]ing b[expletive]" and made clear that he would "have the ass" of anyone went against his instructions to single-source EPCP work with Gibbs & Cox.

90.     Relator was not physically in attendance at this Progress and Analysis Meeting, but was participating by phone and accordingly heard all of Mr. Stammetti's comments directed at him and at Ms. Palmer.

91.     Several weeks later, Ms. Palmer was terminated from her position.

92.     Even after this incident, Relator still worked diligently to fix the deep structural problems with BAE Mayport's purchasing system.

93.     One of the proposals that Relator submitted to his managers was restructuring the Purchasing Department to add greater accountability and oversight.

94.     Specifically, he proposed moving the estimators, who at that time were part of the Contracts Department, to the purchasing department under Relator's supervision.

95.     Relator's managers not only rejected these proposals, they reorganized the departments on July 30, 2012 to take away most of Relator's remaining oversight duties. Specifically, the estimators were moved to the Planning Department rather than Purchasing, and the subcontract administrators who had previously reported to Relator were moved to the Contracts Department.

96.     As a result of this reorganization, Relator was left with only two direct reports, a senior buyer and the Supervisor of Materials (*i.e.* the head of the warehouse).

### iii.     Internal Audit of Estimating and Purchasing Systems

97.     Due to the hostility Relator faced from his managers in Mayport, Relator also reached out during this period to officials at BAE Ship Repair's North American corporate headquarters in Norfolk, Virginia.

98.     As a result of Relator's communications, corporate leadership made the decision to send an internal auditor named Kenwyn Baptiste to audit BAE Mayport's purchasing system.

99.     Mr. Baptiste was on-site from May 29, 2012 to June 1, 2012 and reviewed purchasing orders and supply agreements with Relator's assistance and cooperation.

100.     On June 19, 2012, Mr. Baptiste submitted his report to Jamie McPhee, Director of Finance for Ship Repair, Brad Moyer, Director of Purchasing for Ship Repair, and Sandra Morgan, Purchasing Manager, all of whom were based in Norfolk.  Mr. Baptiste also submitted a courtesy copy to Relator a few weeks later.

101.     Mr. Baptiste's audit report confirmed all of Relator's prior comments and concerns regarding the systemic failures BAE Mayport's purchasing system.

102.     Among his many findings, Mr. Baptiste's audit report concluded that:

a.   "No price analysis is being done, for orders over $3k."
b.   "Buyers have been told to use PO [purchase order] justification in SREP, but this is not being done correctly and sometimes not at all."
c.   "Written request for quote (RFQ) not part of the PO record for orders over $25K."
d.   "Not doing non-competitive award justification."

103.     Mr. Baptiste also noted the following defects, with respect to 16 subcontract purchase orders he had audited:

a.   "No requisition printed."
b.   "No request for proposal (RFQ) (Estimating Dept issues and receives all quotes)"
c.   "No price analysis done due to not having quotes"
d.   "Source selection explanation not done (Estimating does all source selection)"

104.     Based on these serious deficiencies, Mr. Baptiste recommended a number of steps that BAE Mayport needed to take to bring its purchasing system into compliance.  Most notably, Mr. Baptiste stated that "Purchasing has no input in source selection process, purchasing should be the lead with input from estimating and PM's."

105.     Despite Mr. Baptiste's audit report and recommendations, BAE Mayport never took any steps to implement any of his proposals.

106.     Relator does not know whether BAE Ship Repair ever even shared the findings of the audit report with any of Relator's managers in Mayport.

107.    Dave Jonis, Relator's direct supervisor and the BAE Jacksonville Procurement Manager, was at least aware of the audit, as Mr. Jonis sent Relator an email at one point emphasizing that Relator worked for him and admonishing Relator not to talk to Norfolk (*i.e.* managers in BAE Ship Repair's corporate office in Norfolk, Virginia).

**B.      BAE Mayport Conspires with Subcontractors to Rig Bids and Overcharge the United States**

  **i. General Scheme**

108.    These major, systemic failures in BAE Mayport's purchasing system had much larger consequences than just inefficiency and poor documentation.

109.    The lack of proper estimating, pricing, and contract management also created cover for BAE Mayport to either keep work for itself or to source work to its preferred contractors without any true regard for whether the costs being submitted to the Navy were reasonable.

110.    The MSMO contract expressly recognized the central role that a contractor's estimating and accounting system plays in controlling costs.  Specifically, the contract incorporated FAR 31.201-2(c), which establishes that "costs resulting from such inconsistent [accounting] practices in excess of the amount that would have resulted from using practices consistent with this subpart are unallowable."  48 C.F.R. §31.201-2(c) (Sept. 2010).

111.    Despite these express provisions, BAE Mayport knowingly and consistently awarded work to subcontractors without engaging in any meaningful bidding, and without any meaningful cost controls, which resulted in the submission of invoices to the United States for unreasonable and inflated costs.

112.    As the successor to Atlantic Marine Mayport, BAE Mayport assumed Atlantic's place in the four-way Teaming Agreement with Earl, North Florida Shipyards, and QED, and has

consistently followed the terms of that agreement in its role as prime MSMO contractor at Mayport Naval Station.

113.    Under the Federal Acquisition Regulations, teaming agreements are not necessarily unlawful.  In fact, the FARs recognize that such arrangements can be beneficial to the government in certain circumstances and may offer the "best combination of performance, cost, and delivery for the system or product being acquired."  48 C.F.R. §9.602(a).

114.    However, the FARs are equally clear that the existence of a teaming agreement does not excuse violations of federal anti-trust statutes or limit the Government's right to "pursue its policies on competitive contracting, subcontracting, and component breakout after initial production or at any other time."  48 C.F.R. §9.604(d).

115.    Here, in violation of both the MSMO contract and federal False Claims Act, BAE Mayport and the Subcontractor Defendants have knowingly and deliberately inflated costs and restricted competition in performing maintenance and repair work under the MSMO contract.

116.    Because the MSMO contract compensates BAE Mayport for its incurred costs, these inflated costs and rigged bids have necessarily resulted in financial harm to the United States.

ii.      **Bid Rigging for Repair and Maintenance Work on the USS *Hue City***

117.    Throughout the period that Relator worked for BAE Mayport, it was the company's practice to divide up ship repair and maintenance work between itself, Earl, North Florida Shipyards, and QED, with little to no consideration for the ultimate cost to the United States.

118.    On various different occasions during his employment at BAE Mayport, Relator attempted to compete work more broadly.  Specifically, he suggested that BAE Mayport solicit

quotes from Main Industries and George Sharp, two companies with a presence in the Jacksonville area that Relator knew were capable of performing much of the needed maintenance work. However, BAE Mayport's management repeatedly directed Relator and other employees not to include Main Industries or George Sharp when sending out requests for quotes.

119.    For example, as part of his duties, Relator performed an internal review of Job 64101, which involved various repair and maintenance tasks for the USS *Hue City* while it was in port in December of 2011.

120.    Relator found that BAE Mayport had not followed any real estimating procedures and had not made any formal request for bids.

121.    Instead, BAE Mayport sent requests only to Earl, North Florida Shipyards, and QED. Of the three, Earl was the only one that responded to the solicitation and submitted bids.

122.    For at least two items, Relator discovered that Earl had been awarded work despite the fact that its bid was higher than BAE Mayport's internal estimate for that same work. Specifically, Earl was awarded item #110-01-001 on Purchase Order 6810019 for $45,954.00 when BAE Mayport's internal estimate for that same work was $36,455.00. Similarly, Earl was awarded item #512-11-001 on Purchase Order 6810024 for $62,223.00 when BAE Mayport's internal estimate for that same work was $20,171.00.

123.    In a subsequent repair and maintenance job for the USS *Hue City*, in March of 2012, representatives of Earl, BAE Mayport, and North Florida Shipyards actually held an in-person meeting to share their respective cost estimates and decide how to divide up the work. The meeting was held on March 29, 2012, and Relator was in attendance for BAE Mayport, as was Dennis Stokowski, BAE Mayport's MSMO Program Manager, and Pete Cavasino, BAE Mayport's Deputy Program Director for MSMO.

22

124.    By that point, BAE Mayport had already been in discussions with the Southeast Repair and Maintenance Center ("SERMC")—the Navy entity responsible for managing and budgeting for ship repair work at Mayport—and had a list of work that needed to be performed on the *Hue City*.

125.    Prior to the March 29, 2012 meeting, BAE Mayport had distributed this list to Earl and North Florida Shipyards and asked each company to submit estimates on every specific work item they were interested in performing.

126.    At the meeting itself, Mr. Stokowski and Mr. Cavasino distributed a spreadsheet showing a side-by-side comparison of each company's estimated costs on each work item. Relator objected to this practice and pointed out that such sharing of cost-data violated both Procurement Integrity rules and the FARs, but his comments were ignored.

127.    With the relative cost estimates in front of them, the representatives from BAE Mayport, Earl, and North Florida Shipyards proceeded to discuss which entity wanted to perform which work items.

128.    As the prime contractor, BAE Mayport then made formal assignments of work based on the discussions during that meeting.

### iii.    Other Examples of Bid Rigging

129.     On April 12, 2012, at a BAE Mayport Production Meeting, Deputy Program Manager Cavasino explained to Relator and other employees in attendance that the company was preparing to meet with its subcontractors and share cost data related to the USS *Carney*, which was returning to port, in the same way as the company had done with respect to the USS *Hue City*.  Relator again expressed his concern that this practice violated Procurement Integrity requirements and the FARs, but he was once again ignored.  Additionally, in light of his

criticisms, Relator was not invited to attend the actual meeting with representatives from the subcontractors.

130.    At another meeting, on May 15, 2012, Deputy Program Manager Cavasino explained to BAE Mayport Program Managers that pursuant to the Teaming Agreement, BAE Mayport was to carve out no more than 30% of the MSMO repair and maintenance work for itself, and was to divide the rest between Earl and North Florida Shipyards, based on which of the two submitted the lower bid.  Program managers were specifically instructed to subcontract this 70% of the work regardless of whether BAE was able to perform specific work items itself at a lower cost.

131.    At that meeting, Deputy Program Manager Cavasino further explained that for any specific work item, if only one subcontracting bid was received (*i.e.*, either Earl or North Florida Shipyards declined to submit a bid), it was then acceptable to compare the external quote (*i.e.,* the quote from Earl or North Florida Shipyards) to BAE Mayport's internal cost estimate and award the work to the lower cost-entity.

132.    On May 24, 2012, various BAE Mayport managers, including Relator, met to discuss upcoming repair and maintenance work on USS *The Sullivans*, which was scheduled to be back in port in the near future.

133.    Much of the scheduled work for *The Sullivans* had originally been awarded to North Florida Shipyards.  However, North Florida Shipyards later withdrew its bid, and BAE Mayport transferred the work to Earl.

134.    At the planning meeting, Relator asked how BAE Mayport was justifying the award to Earl, and was initially told that it was being justified based on an analysis of North Florida Shipyards' initial bids and on BAE Mayport's own internal estimates.

135.     Relator pointed out that neither set of estimates was a valid basis to justify the award to Earl, given that North Florida Shipyards had withdrawn its bid and that BAE's estimates were prepared by estimators who had also solicited bids from Earl and North Florida and accordingly had access to their cost data in the course of preparing BAE Mayport's internal estimates.

136.     When Relator pressed on this point, Senior Estimator Mike Cook told Relator that he had been instructed to give the work to Earl in order to maintain the work distribution percentages spelled out in the Teaming Agreement.

### iv.     BAE Mayport Knowingly Fails to Maintain Required Documentation

137.     In addition to these examples of collusion and bid rigging between BAE Mayport and the Subcontractor Defendants, Relator was also regularly instructed to process and approve purchase orders for work performed by Subcontractor Defendants that lacked any documentation establishing the reasonableness of the work or the nature of the work being billed.

138.     For example, Purchase Order No. 57PO5908 was issued to Earl Industries for two welders at a flat rate of $8,500, with no description of hours to be worked, hourly rates, or even a statement of the work to be performed.

139.     Based on Relator's concerns that purchase orders were not being properly documented, he spent several hours on July 5, 2012 reviewing subcontractor purchase order justifications in the SREP system that subcontract administrators had prepared over the previous month.  Of the approximately 150 records that he reviewed, Realtor found that around 80% of them contained no data to justify the purchase order.  Relator further found that of these 80%, approximately half were purchase orders for payments to Earl.

25

140.    At a meeting called by Dale O'Bar, Contracts Manager, on September 18, 2012 Mayport Management and Subcontract Administrators were asked to sort out over $1 million in cost overruns associated with the MSMO contract since its inception. The intent was to submit these costs to the Navy as "New Conditions Found" in order to get reimbursed under the contract. After an hour of going over the Contract Status Schedule Reports (CSSR) and other financial spreadsheets/reports it was decided by Joe Kudashick, BAEM Director of Operations, to adjourn the meeting due to the numbers not tying between the different reports and reconvene at a later date.

141.    Relator indicated at this meeting that many of the cost overruns were associated with Purchase Price Variance (PPV) issues caused by the buyer placing purchase orders for a higher price than originally quoted by the suppliers and agreed to with the Navy.  Accordingly, these costs should not have been recoverable under the contract.

### v.    BAE Mayport Fraudulently Subcontracts Work to BAE Jacksonville on a Single-Source Basis.

142.    While BAE Mayport was farming most of the repair and maintenance work under the MSMO contract to Earl, North Florida Shipyards, and QED, one type of work that it never sent to its Team Agreement partners was dry-docking work.

143.    Instead, BAE Mayport subcontracted all dry dock work to BAE's commercial shipyard in Jacksonville, which was operated by Defendant BAE Systems Southeast Shipyards, AMHC, Inc. ("BAEJ"), on a sole source basis.

144.    BAEJ did, in fact, operate the only nearby dry dock, so it was reasonable to subcontract dry-dock work with BAEJ as a sole source supplier, rather than competing the work.

145. The problem with this relationship was that BAE Mayport was awarding work to BAEJ as a subcontractor at that same time that BAEJ had ultimate operational control over BAE Mayport.

146. Vince Stammetti was the Director and General Manager for both the Jacksonville and Mayport facilities, and Dave Jonis, Procurement Director for BAE Jacksonville, had oversight authority over Relator in Relator's role as Purchasing Manager for BAE Mayport.

147. Combined with BAE Mayport's lack of proper estimating procedures, this organizational overlap with BAEJ created a huge conflict of interest and led to a complete lack of cost controls.

148. Additionally, due to the relationship between BAE Mayport and BAEJ, BAE Mayport would often subcontract work unrelated to the actual dry-docking to BAEJ, rather than competing that work.

149. For example, the USS *Carney* was dry-docked in mid-2012 for approximately three months. During that time, BAE Mayport subcontracted many tasks unrelated to the dry-docking to BAEJ that should have been sourced on a competitive basis. Relator knows specifically that BAE Mayport subcontracted the installation of a ballistic missile to BAEJ on a single-source basis that should have been bid competitively.

**C.**    **BAE Mayport Knowingly Overcharges the United States for Materials and Other Indirect Costs.**

150. At the same time that BAE Mayport was conspiring with Earl, North Florida Shipyards, and QED to rig bids and submit inflated costs for repair and maintenance work, BAE Mayport was also defrauding the United States through the knowing submission of claims for inflated material and indirect costs.

151.    As with labor costs, the FARs provide that the United States will only pay material costs that are "reasonable . . . in its nature and amount." 48 C.F.R. §31.201-3(a).  The FARs further provide that one important consideration of whether a particular cost is reasonable is if it is based on "[g]enerally accepted sound business practices, arm's length bargaining, and Federal and State laws and regulations."  *Id.*

152.    When Relator took his position at BAE Mayport, he found that the buyers in the materials department were no more willing to bid for materials or manage costs than the subcontract managers and estimators were for repair and maintenance work.

153.    Because BAE Mayport was reimbursed by the United States for its costs, this knowing failure to manage material costs resulted in significant overcharges to the United States.

      **i.**      **Specific Examples of Fraudulently Inflated Material and Indirect Costs Billed to the United States.**

154.    In December 2012, Relator learned that materials buyer Fran Estes regularly placed material orders with a local company called Hagemeyer.  Ms. Estes placed these orders without ever sending requests for a quote to either Hagemeyer or any other supplier, resulting in a complete lack of competition.

155.    When Relator questioned Ms. Estes about this practice, she explained that there was an agreement in place between BAE and Hagemeyer based on a catalog of pricing information that Hagemeyer had originally provided to Atlantic Marine in 2008 and updated annually every year since.

156.    Relator looked into this matter and found that the agreement with Hagemeyer had expired, but that BAE continued to purchase parts from Hagemeyer using its annually-updated catalog prices, without engaging in any price competition.

28

157.    Relator ultimately placed a call to Neil Hallman, a sales representative at Hagemeyer, to seek clarification regarding the relationship between the two companies.  Mr. Hallman confirmed that Hagemeyer and BAE Mayport continued to do business pursuant to the expired agreement and based upon the prices set forth in the catalog, and that BAE Mayport never submitted requests for a quote.  Additionally, Mr. Hallman noted that he was a good friend of Dave Jonis, the BAE Jacksonville Procurement Manager and Relator's immediate supervisor at the time.

158.    Based in part on her failure to conduct any kind of cost analysis or submit requests for quotes, Relator gave Ms. Estes a mediocre performance rating that year– a 3 on a scale of 5 – and recommended only a 2.5% increase in salary.

159.    On January 20, 2013, Dave Jonis directed Relator to increase Ms. Estes' performance rating to a 5, to promote her from a level 09 to a level 10 employee, and to give her a 10% salary increase.

160.    Another, more egregious example of such inflated pricing relates to the purchasing of watertight doors for USS *The Sullivans* in June and July of 2012.

161.    Several months after these two doors had been ordered, Relator had occasion to research their purchasing history, in an attempt to resolve a possible missed delivery deadline.

162.    In researching the purchase history on these two doors, Relator uncovered that BAE Mayport had submitted a bid to the government well above what the supplier had actually quoted BAE.

163.    Specifically, Relator found an email quote from the supplier, Pacific Ship Repair and Fabrication, dated June 29, 2012, offering to sell one of the doors (identified as item 167-11-001) for $6,625.00 and the other (identified as item 167-11-002) for $7,825.00.

164.    BAE Mayport then submitted a request for approval to SERMC, quoting unit prices of $6,725.00 and $8,175.00, respectively, which SERMC authorized by letter dated July 17, 2012.   These quoted unit prices were $100 and $350 more expensive than the unit prices Pacific Ship Repair and Fabrication had actually quoted to BAE Mayport.

165.    Relator further discovered that BAE Mayport created a revised purchasing order, PO #57P11753, stating unit costs for the same two doors of $9,289.00 and $9,529.00.   These increased costs supposedly resulted from an "expediting cost" to have the items ready in 6-8 weeks, rather than 8-10 weeks.   There was no evidence of a revised quote or of any other documentation in the file to support these revised prices.

166.    Moreover, the file reflected that Pacific Ship Repair had not actually delivered the two doors within the expedited time frame, but that BAE Mayport paid the expediting costs pursuant to PO #57P11753 anyway and then submitted these costs to the Navy for reimbursement.

167.    In addition to these straight-forward mark-ups, Relator's review of the purchasing history showed no evidence of BAE Mayport having engaged in any type of bidding or other cost controls for these materials.

168.    Additionally, BAE Mayport regularly awarded jobs to suppliers without going through the procurement system at all, and then directed the Procurement Department to create a purchase order after the fact.

169.    For example, Joe Kudashick, Director of Operations for BAE Mayport, submitted a $24,489.77 invoice from InSync Consulting dated April 24, 2012 for two "Excelerated" coaching packages (*i.e.* leadership training) and related costs.   Director Kudashick told the Procurement Department to process and pay it.

170.    Upon researching the invoice, Relator discovered that there was no requisition or purchase order in the system related to this invoice.

171.    In order to pay the invoice, the SREP system requires the existence of a purchase order.

172.    While Relator was not willing to create a retroactive purchase order, another employee within the Procurement Department, who was concerned for that employee's job, did ultimately create the backdated purchase order and pay the invoice, at the direction of General Manager Vince Stammetti, and this invoice was ultimately submitted to the United States for reimbursement.

>    ii.    **BAE Mayport – in addition to other BAE entities – deliberately overcharges for Indirect Material costs as part of a broader kickback scheme between BAE Systems, Xchanging, and Grainger**

173.    In addition to the specific examples and policies described above, Relator learned of a much broader scheme to defraud the government through the submission of inflated claims for maintenance, repair, and overhead items – items such as nails, screws, and bolts that were used by BAE in performing work under government contracts such as the Mayport MSMO contract.  This scheme resulted from a three-way agreement between Defendant BAE Systems, Defendant XChanging, and Defendant Grainger.

174.    In 2011, while Relator was still working for BAE out of BAE's Fairfield, Ohio location, he attended a Director's Meeting in Washington that was also attended by Bob Lazenby, Procurement Director for BAE Systems Indirect Commodity Materials Operations.

175.    During this meeting, Mr. Lazenby explained that BAE had recently entered into an arrangement with X-Changing Sourcing Solutions ("Xchanging") whereby Xchanging would negotiate, on behalf of BAE, national contracts for various types of indirect materials.

176.     Later, in a separate meeting in Ohio, also in 2011, Mr. Lazenby explained that BAE would receive a rebate from Xchanging at the corporate level as a form of volume discount associated with all contract volume generated by this agreement.

177.     In 2012, after Relator had relocated to Mayport, Relator was told not to re-negotiate any of his long-term contracts for maintenance, repair, and overhead items, as BAE would be contracting exclusively with Defendant Grainger for such items in the future.

178.     This represented a change from BAE Mayport's practice at the time, which was to purchase its maintenance, repair, and overhead items from various suppliers—including Grainger, but also included other national and regional suppliers.

179.     When Relator questioned this decision to obtain all or most of BAE Mayport's maintenance, repair and overhead items from Grainger, he was again told that BAE had an exclusive agreement with Xchanging, and that Grainger was the maintenance, repair, and overhead materials supplier that Xchanging had selected.

180.     When Relator checked Grainger's pricing, he found that it was charging 40-50% more than what BAE Mayport was currently paying for many of its indirect materials.

181.     Sometime in or around October of 2012, Relator called a meeting with Ed Edminton, a sales representative for Grainger, to discuss pricing and the types of parts that BAE Mayport needed.  During that meeting, Relator explained that he would not switch to Grainger as a supplier for many of the listed items unless Grainger was able to offer more competitive prices. Mr. Edminton responded that he would go back to Grainger and see what he could do.

182.     At a follow-up meeting several weeks later, Mr. Edminton presented pricing information to Relator that was better than what he had previously presented, but still higher than what BAE Mayport was currently paying.  When Relator pointed this fact out to Mr. Edminton,

Mr. Edminton responded that the prices were higher due in part to a 35% markup required by XChanging.

183.     In a separate phone call with Patrick Dimond, Senior Corporate Sales Manager at Grainger, Relator again raised questions about Grainger's high prices.  When Relator pressed Mr. Dimond on this point, Mr. Dimond eventually conceded that the costs were higher in part because Grainger had been required to "pay to play"—*i.e.* pay Xchanging in order to have Xchanging select Grainger as the preferred national-level maintenance, repair, and overhead items supplier for BAE Systems.

184.     Given the higher prices and ethical concerns, Relator did not agree to enter into any additional materials contracts with Grainger for BAE Mayport.

185.     After the second meeting with Ed Edminton, Relator complained to Dave Jonis, Relator's direct superior and the Purchasing Manager of BAE's commercial shipyard in Jacksonville, Florida and Vince Stammetti, Director & General Manager for Jacksonville and Mayport Operations and Joseph Kudaschick, Director of Operations for Mayport.  Relator was particularly concerned that if BAE Mayport began ordering these materials from Grainger, then the upcharge would be passed along to the United States, as BAE Mayport's MSMO contract provided for the reimbursement of such materials as "direct indirect" costs.

186.     In response, Dave Jonis, Vince Stammetti, and Joseph Kudaschick told Relator about the rebate BAE corporate was receiving from XChanging and that working with Grainger was "for the good of the company."

187.     Despite the pressure he received from Dave Jonis, Vince Stammetti, and Joseph Kudaschick, Relator never agreed to order BAE Mayport's indirect materials from Grainger.

188.    Upon information and belief, after Relator was terminated from his position in early 2013, BAE Mayport began ordering its indirect materials from Grainger and passing the XChanging markup along to the United States.

## CAUSES OF ACTION

## COUNT I

**Federal False Claims Act**
**31 U.S.C. §3729 (a)(1)(A) – asserted against all Defendants**

189.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

190.    Defendant BAE Systems Southeast Shipyards Mayport, LLC ("BAE Mayport") knowingly submitted false claims for payment to the United States, in the form of fraudulently inflated invoices that the United States reimbursed pursuant to the terms of the MSMO contract.

191.    Defendants BAE Systems Southeast Shipyards, AMHC, Inc.; Earl Industries, LLC; North Florida Shipyards, Inc.; and QED Systems, Inc. ("Subcontractor Defendants") all knowingly caused the submission of false and fraudulent claims for payment through the development of inflated cost estimates that Subcontractor Defendants knew BAE Mayport would accept, pay, and submit for reimbursement to the United States.

192.    The claims that BAE Mayport submitted, and that the Subcontractor Defendants caused to be submitted, were false and fraudulent within the meaning of the False Claims Act because they did not comply with material conditions of payment established by the MSMO contract.  Specifically, the MSMO contract incorporated FAR Subpart 31.2 by reference, which states that contractors are only entitled to reimbursement for "reasonable" costs, which are defined as costs that, in nature and amount, do "not exceed that which would be incurred by a prudent person in the conduct of competitive business."  48 C.F.R. §31.201-3(a) (Sept. 2010).

34

193.     Additionally, FAR subpart 31.2 provides that when a contractor's accounting practices are inconsistent with the FARs' requirements, "costs resulting from such inconsistent practices in excess of the amount that would have resulted from using practices consistent with this subpart are unallowable." 48 C.F.R. §31-201-2(c) (Sept. 2010).

194.     In violation of these material conditions of payment, Defendant BAE Mayport and the subcontractor Defendants having knowing submitted and/or caused the submission of claims seeking reimbursement for unreasonable, inflated costs.

195.     As a result of the false and fraudulent claims submitted or caused to be submitted by BAE Mayport and the Subcontractor Defendants, the United States has suffered damages and is therefore entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty for each such false or fraudulent claim presented or caused to be presented by the Defendants.

196.     Each false claim submitted or caused to be submitted by BAE Mayport and the Subcontractor Defendants is subject to a penalty of between $5,500 and $11,000.

## COUNT II

### Conspiracy to Violate the Federal False Claims Act
### 31 U.S.C. §3729 (a)(1)(C) – asserted against all Defendants

197.     Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

198.     BAE Mayport and the Subcontractor Defendants have all conspired to knowingly present false and fraudulent claims to the United States for payment.

199.     Acting under the terms of the work-share targets contained in their Teaming Agreement, BAE Mayport and the Subcontractor Defendants have shared pricing data, colluded

on ship repair and maintenance work, and submitted non-competitive subcontracting bids to BAE Mayport that BAE Mayport approved, paid, and invoiced to the United States.

200.    As a result of this conspiracy to submit false and fraudulent claims, the United States has suffered damages and is therefore entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty for each such false or fraudulent claim presented or caused to be presented by the Defendants.

201.    Each false claim submitted or caused to be submitted by BAE Mayport and the Subcontractor Defendants is subject to a penalty of between $5,500 and $11,000.

## COUNT III

### Defendant BAE Mayport's Knowing Retention and Concealment of Funds Overpaid by the Government 31 U.S.C. §3729(a)(1)(G) – asserted against Defendant BAE Mayport

202.    Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

203.    At all times relevant to this Complaint, Defendant BAE Mayport received overpayments from the United States – arising from BAE Mayport's claims for payment for unnecessary work, for work that was never performed, and for cost reimbursements over and above the costs that BAE Mayport actually incurred.

204.    Based on its own policies, and from concerns expressed directly by Relator to his managers, Defendant had notice that it was being paid money from the United States that it was not lawfully entitled to receive.

205.    Defendant BAE Mayport was legally obligated to return these funds that the United States had inadvertently overpaid.

206.    In violation of this legal obligation, Defendant knowingly and actively concealed and improperly avoided its obligation to return these overpaid funds.

207.    By virtue of this knowing concealment, the United States has suffered actual damages.

208.    Defendant BAE Mayport is liable to the United States for treble damages under the FCA, in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each false claim presented or caused to be presented by Defendant.

## COUNT IV

**Unlawful Demand for and Payment of Kickbacks**
**31 U.S.C. §3729(a)(1)(A)-(B) – asserted against Defendants BAE Mayport, BAE Systems, Xchanging, and Grainger**

209.    Relator repeats and re-alleges each and every allegation contained in the paragraphs above as though fully set forth herein.

210.    Federal law recognizes that any claim for payment on the federal government arising from an unlawful kickback is a false and fraudulent claim.  42 U.S.C. §1320a-7b(g).

211.    At all times relevant to this Complaint, Defendants BAE Mayport, BAE Systems, Inc., Xchanging, and Grainger pursued a general scheme wherein Grainger paid monetary kickbacks to Xchanging and Xchanging paid monetary kickbacks to BAE Systems to induce BAE systems to order its indirect materials from Grainger.

212.    In exchange, Grainger charged inflated prices for these indirect materials, some portion of which BAE Systems passed along to the United States pursuant to various cost reimbursement contracts between the United States and BAE Systems and its subsidiaries.  One such cost reimbursement contract was the Mayport MSMO contract between Defendant BAE Mayport and the United States Navy.

213.     Defendant BAE Systems and its subsidiaries have knowingly presented claims for payment to the United States for indirect material costs that BAE Systems and its subsidiaries knew were fraudulently induced by unlawful kickbacks.

214.     By virtue of these false and fraudulent claims, the United States has suffered actual damages.

215.     Defendants are jointly and severally liable to the United States for treble damages under the FCA, in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each false claim presented or caused to be presented by Defendants.

### COUNT V

**Retaliation Against Relator for his Efforts
to Stop Defendants from Defrauding the United States
31 U.S.C. §3730(h) – Asserted Against Defendant BAE Mayport**

216.     Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

217.     Chapter 31, Section 3730(h) of the United States Code protects employees, contractors, and agents, from being "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent . . . in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter."

218.     Prior to filing this False Claims Act lawsuit, Relator repeatedly reported on and attempted to stop Defendant BAE Mayport from defrauding the United States.  Specifically, Relator reported Defendant's illegal activities, both verbally and in writing, to Defendant's local management and Defendant's management at its North American Ship Repair headquarters in Norfolk, Virginia.

219.     Instead of taking necessary corrective action, Defendant, through the actions of Mr. Stammetti, its General Manager of the Southeast Shipyards in Jacksonville, and David Jonis, its Purchasing Manager for the Southeast Shipyards in Jacksonville, acting in the course and scope of their employment for Defendant, retaliated against Plaintiff as follows:

    a.   Systematically stripping Plaintiff of the majority of his duties and responsibilities as Purchasing Manager for Defendant's Mayport Naval Station facility;

    b.   Excluding Plaintiff from subcontractor and Program Status review meetings;

    c.   Ordering Plaintiff to keep out of all interactions and procedures involving the issuing of work to suppliers and subcontractors;

    d.   Humiliating Plaintiff in front of his co-workers in company meetings—including, most egregiously cursing Relator and submitting him to racial epithets at BAE Mayport staff meetings; and

    e.   Systematically removing and reassigning Plaintiff's support staff.

220.     Plaintiff complained internally about these retaliatory acts, but no corrective action was ever taken.  Instead, on February 14, 2013, Plaintiff, in a meeting attended by Stammetti and others, was told he was being permanently laid off, effective immediately.  In the meeting, Plaintiff inquired if he was going to be given his notice of his rights under the federal Worker Adjustment and Retraining Act ("WARN"), and was told no, that his lay off was to be final and permanent separation.

221.     Plaintiff did not return to work.  However, he learned that on February 14, 2013, Defendant issued WARN notices to all employees who were purportedly to be laid off from Defendant's Mayport Naval Station facility.  As a result of these WARN notices, many employees were able to secure work with Defendant and not be laid off.  On March 6, 2013,

Plaintiff also received a notice from Defendant informing him of his WARN rights, and further informing him that his termination would be effective as of May 6, 2013.

222.    Relator has not been able to secure full-time employment since being terminated from BAE Mayport.

223.    Defendant is liable to Relator for reinstatement to the same seniority and status he held before his constructive discharge, two times the amount of actual back pay from the date of his constructive discharge, litigation costs, and reasonable attorneys' fees.

**COUNT VI**

**Retaliation in Violation of Florida Whistleblower Act
Fla. Stat. §§448.101, et seq. – Asserted Against Defendant BAE Mayport**

224.    The Florida Whistleblower Act states that it is unlawful for an employer, as defined in §448.101(3), to take any retaliatory personnel action against an employee who has objected to or refused to participate in any violation of law and regulation by the employer.

225.    Plaintiff-Relator engaged in protected activity for purposes of §448.102(3) by objecting to the illegal conduct engaged in by Defendant as alleged in the paragraphs above.

226.    Defendant is an "employer" as defined under §448.101(3), Fla. Stat., in that at all relevant times it employed ten (10) or more employees.

227.    Defendant retaliated against Plaintiff-Relator in violation of §448.102(3) by, *inter alia*, stripping Plaintiff-Relator of management and oversight authority and ultimately terminating Plaintiff-Relator's employment, as set forth in the paragraphs above.

228.    As a direct and proximate result of Defendant's retaliation, Plaintiff-Relator has suffered, and will continue to suffer in the future, damages, including lost back pay and lost benefits, lost front pay, emotional distress, mental anguish, humiliation, loss of dignity, and out-

of-pocket expenses.  Plaintiff-Relator is also entitled to recover his reasonable attorney's fees pursuant to §448.104.

## PRAYER FOR RELIEF

WHEREFORE, for the reasons set forth above, Plaintiff-Relator Julio E. Hernandez, on behalf of the United States, respectfully requests that the Court enter an award of judgment against BAE Systems Southeast Shipyards Mayport, LLC; BAE Systems Southeast Shipyards, AMHC, Inc.; BAE Systems, Inc.; Earl Industries, LLC; North Florida Shipyards, Inc.; QED Systems, Inc.; Xchanging, Inc.; and W.W. Grainger, Inc.  as follows:

A.      An order requiring Defendants to cease and desist from committing violations of the False Claims Act, 31 U.S.C. §§3729-3733;

B.      An Order entering judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained as a result of its actions, plus a civil penalty against Defendants of $11,000 for each violation of the False Claims Act, pursuant to 31 U.S.C. §3729;

C.      The maximum legal and equitable relief permitted by 31 U.S.C. §3730(h)(2) for Defendant BAE Mayport's retaliatory discharge of Relator;

D.      The maximum legal and equitable relief permitted by Fla. Stat. §§448.101, *et seq.* for Defendant BAE Mayport's retaliatory discharge of Relator;

E.      An order awarding to Relator Hernandez the maximum amount allowed as a "Relator's Share" pursuant to the False Claims Act, 31 U.S.C. §3730(d);

F.      An order awarding to Relator Hernandez from Defendants all reasonable expenses that were necessarily incurred; plus reasonable attorneys' fees and costs, under the False Claims Act, 31 U.S.C. §3730(d); and

F.      An Order awarding to the United States and Relator Hernandez all such other relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Relator Hernandez hereby demands trial by jury as to all issues.

DATED: June 27, 2014

Respectfully submitted,

JERRY E. MARTIN (TN BPR# 20193)
SETH M. HYATT (TN BPR# 31171)
BARRETT JOHNSTON MARTIN
    & GARRISON, LLC
Bank of America Plaza
414 Union Street, Suite 900
Nashville, TN 37219
Telephone:  615/244-2202
615/252-3798 (fax)
jmartin@barrettjohnston.com
shyatt@barrettjohnston.com

JANINE D. ARNO (FL BPR# 41045)
ROBBINS GELLER RUDMAN
    & DOWD, LLP
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
jarno@rgrdlaw.com

RODERICK V. HANNAH,
RODERICK V. HANNAH, ESQ., P.A.
4018 Sheridan St.
Hollywood, FL 33021
954/362-3800
954/362-3779 (Facsimile)
rhannah@rhannahlaw.com

PELAYO M. DURAN
LAW OFFICE OF PELAYO
    DURAN, P.A.
4640 N.W. 7th Street
Miami, FL 33126-2309
305/266-9780
305/269-8311 (Facsimile)
pduran@pelayoduran.com