**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel* [PLAINTIFF UNDER SEAL]<br><br>        Plaintiffs,<br><br>        v.<br><br>[DEFENDANTS UNDER SEAL]<br><br>        Defendants. | **RELATOR'S SECOND AMENDED COMPLAINT PURSUANT TO THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§3729 *ET SEQ.***<br><br>**FILED UNDER SEAL**<br><br>**DO NOT PLACE ON PACER**<br><br>CIVIL ACTION NO. 3:14-cv-751-J-34MCR<br><br>**JURY TRIAL DEMANDED** |

**RELATOR'S SECOND AMENDED COMPLAINT PURSUANT TO**
**THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§3729 *ET SEQ.***

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel* JULIO E. HERNANDEZ<br><br>          Plaintiffs,<br><br>          v.<br><br>BAE SYSTEMS SOUTHEAST SHIPYARDS MAYPORT LLC; BAE SYSTEMS SOUTHEAST SHIPYARDS AMHC INC.; BAE SYSTEMS, INC.; EARL INDUSTRIES, L.L.C.; NORTH FLORIDA SHIPYARDS, INC.; QED SYSTEMS, INC.; XCHANGING INC.; W.W. GRAINGER, INC.,<br><br>          Defendants. | **RELATOR'S SECOND AMENDED COMPLAINT PURSUANT TO THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§3729 *ET SEQ.***<br><br>**FILED UNDER SEAL**<br><br>**DO NOT PLACE ON PACER**<br><br>CIVIL ACTION NO. 3:14-cv-751-J-34MCR<br><br>**JURY TRIAL DEMANDED** |

**RELATOR'S SECOND AMENDED COMPLAINT PURSUANT TO**
**THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§3729 *ET SEQ.***

1.    Relator Julio E. Hernandez (referred to herein as "Relator"), on behalf of the United States of America, brings this action against BAE Systems Southeast Shipyards Mayport LLC; BAE Systems Southeast Shipyards AMHC Inc.; BAE Systems, Inc.; Earl Industries, L.L.C.; North Florida Shipyards, Inc.; QED Systems, Inc.; Xchanging Inc.; and W.W. Grainger, Inc. (collectively, "Defendants"), for violations of the Federal False Claims Act ("FCA"), 31 U.S.C. §§3729 *et seq.*, to recover all damages, civil penalties and other recoveries provided for under the FCA.

**I.    THE PARTIES**

2.    Defendant BAE Systems Southeast Shipyards Mayport LLC, (hereinafter "BAE Mayport") is a Delaware limited liability company and wholly-owned subsidiary of Defendant BAE Systems Southeast Shipyards AMHC Inc., a Florida corporation.   During all periods

Relator worked for BAE Mayport, and continuing to the present day, BAE Mayport served as the prime contractor on a Multi-Ship Multi-Option ("MSMO") contract with the United States Navy to repair and maintain cruisers and destroyers at the Mayport Naval Station in Mayport, Florida.

3.      Defendant BAE Systems Southeast Shipyards, AMHC, Inc. (hereafter "BAE Jacksonville" or "BAEJ"), is a Florida corporation and owner of BAE Mayport.  In addition to its naval contracting operations through BAE Mayport, BAE Systems operates a commercial dry-dock and ship repair facility in Jacksonville, Florida.

4.      Defendant BAE Systems, Inc., (hereafter "BAE Systems") is the overall corporate parent of both BAE Mayport and BAE Jacksonville.  BAE Systems is a Delaware Corporation with a principal place of business in Arlington, Virginia.

5.      Defendant Earl Industries, L.L.C., (hereafter "Earl") is a Virginia limited liability company with a principal place of business in Portsmouth, Virginia.  During the periods relevant to this complaint, Earl has worked with BAE Mayport as a subcontractor on BAE Mayport's MSMO contract with the U.S. Navy.  In August of 2012, the Ship Repair and Coatings Division of Earl Industries—the division that subcontracted with BAE Mayport—was acquired by General Dynamics Corporation, a Delaware Corporation with a principal place of business in Falls Church, Virginia.

6.      Defendant North Florida Shipyards, Inc. (hereafter "North Florida Shipyards") is a Florida corporation with a principal place of business in Jacksonville, Florida.  During the periods relevant to this complaint, North Florida Shipyards has worked with BAE Mayport as a subcontractor on BAE Mayport's MSMO contract with the U.S. Navy.

7.      Defendant QED Systems, Inc. (hereafter "QED") is a Virginia corporation with its principal place of business in Virginia Beach, Virginia.  During the periods relevant to this

complaint, QED has worked with BAE Mayport as a subcontractor on BAE Mayport's MSMO contract with the U.S. Navy.

8.      Defendant Xchanging, Inc. ("Xchanging"), is a Delaware corporation and subsidiary of the London-based procurement services company Xchanging PLC.  At all times relevant to this complaint, Xchanging has provided procurement services to BAE Systems and its subsidiaries, including BAE Mayport and BAE Jacksonville.

9.      Defendant W.W. Grainger, Inc. ("Grainger"), is an Illinois Corporation headquartered in Lake Forest, Illinois.  During periods relevant to this Complaint, Defendants Xchanging and BAE Systems selected Grainger to be the primary indirect materials supplier for BAE Systems and its subsidiaries.

10.     The United States is a plaintiff to this action.  The United States brings this action on behalf of the Department of the Navy, a department within the United States Department of Defense.  At all times relevant to this complaint, the Navy's MSMO contract with BAE Mayport was administered and overseen by a Navy organization called the Southeast Regional Maintenance Center ("SERMC").

11.     Relator is a former employee of Defendant BAE Mayport and has standing to bring this action pursuant to 31 U.S.C. §§3730(b)(1) and 3730(e)(4).  Relator's Complaint is not based on any prior disclosures of the allegations or transactions discussed herein in any criminal, civil, or administrative hearing or lawsuit. Relator has previously disclosed these allegations to the Department of Defense, Office of Inspector General ("DoD OIG") well before initiating this proceeding, and is an original source for such allegations, as defined by 31 U.S.C. §3730(e)(4).

12.     Relator has direct and personal knowledge of the fraudulent schemes alleged in this complaint.  As the former Purchasing Manager for BAE Mayport, Relator has personal

knowledge of how BAE Mayport's purchasing system operated and all of the ways that it failed to meet the minimum requirements demanded by the United States.  Relator also has direct knowledge, based on his understanding of the purchasing system, that these unlawful procurement policies actually resulted in the submission of false and fraudulent claims for reimbursement to the United States.

## II.   SUMMARY OF THE ACTION

13.   Relator, on behalf of the United States, brings this case to challenge Defendants' various, interrelated schemes to defraud the United States Navy.

14.   At the center of these interrelated schemes is BAE Mayport, Relator's former employer and the Navy's prime contractor on its multi-ship multi-option ("MSMO") ship repair contract for the Mayport Naval Station.

15.   In its role as the Navy's prime contractor, BAE Mayport has engaged and continues to engage in a conspiracy with its major subcontractors—Earl Industries, Inc., North Florida Shipyards, Inc., and QED Systems, Inc.—to defraud the United States by rigging bids on ship repair work for the Navy.  This bid rigging has resulted in the United States paying falsely inflated, non-competitive prices for many of the specific repair projects covered by the MSMO contract.

16.   During the same period, BAE Mayport has engaged in a scheme to knowingly bill the United States for goods and services provided by debarred, unapproved, or otherwise impermissible subcontractors, in direct violation of the terms of the MSMO contract.

17.   BAE Mayport has also engaged in a separate scheme to defraud the United States by overcharging the United States for parts, materials, and indirect costs under BAE Mayport's MSMO contract.

18.     BAE Mayport's scheme to overcharge the United States for parts, materials, and indirect costs is, in turn, part of a broader scheme by BAE Mayport's corporate parent, BAE Systems, together with Xchanging and Grainger, to overcharge the United States for parts, materials, and indirect costs.  As part of this scheme, Xchanging has paid kickbacks to BAE in return for BAE using Xchanging's recommended materials supplier.

19.     In May and June of 2012, Relator arranged for a BAE internal audit of the purchasing system at BAE Mayport.  This audit confirmed that the procurement system did not comply with BAE Mayport's contractual and legal obligations, thus facilitating Defendants' fraudulent schemes.  Both BAE and BAE Mayport ignored the audit results and failed to take any steps to cure the deficiencies. Rather than take any corrective action, BAE Mayport retaliated against Relator and ultimately terminated him from his job in early 2013.

## III.     JURISDICTION AND VENUE

20.     Jurisdiction is founded upon the FCA, 31 U.S.C. §§3729, *et seq*., specifically 31 U.S.C. §3732(a), and also 28 U.S.C. §§1331 and 1345.  Jurisdiction for Relator's state law claims is founded upon 28 U.S.C. §1367.

21.     Venue in the Middle District of Florida is appropriate under 31 U.S.C. §3732(a) in that, at all times material to this civil action, one or more of the Defendants transacted business in the Middle District of Florida, or submitted or caused the submission of false claims in the Middle District of Florida.

## IV.     APPLICABLE LAW

### A.     THE FALSE CLAIMS ACT

22.     The FCA, 31 U.S.C. §§3729-3733, provides, *inter alia*, that any person who (1) "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or

approval," or (2) "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," is liable to the United States for a civil monetary penalty plus treble damages.  31 U.S.C. §3729(a)(1)(A)-(B).

23.    The FCA further provides, under 31 U.S.C. §3729(a)(1)(G), that any person who "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money to the Government" is liable to the United States for a civil monetary penalty plus treble damages.

24.    The terms "knowing" and "knowingly" are defined to mean "that a person, with respect to information - (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information."   31 U.S.C. §3729(b)(1)(A)(i)-(iii).   Proof of specific intent to defraud is not required.  31 U.S.C. §3729(b)(1)(B).

25.    The term "material" means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  31 U.S.C. §3729(b)(4).

26.    Pursuant to 31 U.S.C. §3729(b)(2)(A)(i)-(ii), the term "claim" means:

> any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that - (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government - (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

27.    Federal courts, including the United States Supreme Court, have long recognized that rigging bids under federally-funded contracts results in false and fraudulent payments to contractors and accordingly creates liability under the FCA.  *U.S. ex rel. Marcus v. Hess*, 317 U.S. 537, 542-43 (1943).

28.     In addition to creating liability for those who submit or cause the submission of false claims, 31 U.S.C. §3729(a)(1)(C) creates liability for any person who "conspires to commit violations" of other sections of the FCA, which includes conspiracies to present and obtain payment for false and fraudulent claims.

**B.      FEDERAL ACQUISITION REGULATIONS**

29.     The Federal Acquisition Regulations ("FARs") are promulgated by the Federal Government to establish "uniform policies and procedures for acquisition by all executive agencies."  48 C.F.R. §1.101.

30.     The driving principle behind the FARs is to "deliver on a timely basis the best value product or service to the customer [*i.e.* government agency],while maintaining the public's trust and fulfilling public policy objectives."  48 C.F.R. §1.102(a).

31.     In addition to providing general guidance to federal contracting officers and establishing prohibited practices for government contractors, the FARs also include a substantial number of default clauses and provisions for use in contracts between a federal agency and outside contractor.  48 C.F.R. §§52.100, *et seq.*

32.     The federal contracting officer responsible for a particular contract has some discretion over which clauses and provisions to include, but is expressly forbidden from modifying provisions and clauses except where the FARs authorize such modification.  48 C.F.R. §52.104(a).

33.     As the successful bidder on the Mayport Naval Station MSMO contract, BAE Mayport entered into a contract with the Navy's Naval Sea Systems Command ("NAVSEA") that incorporated many of the provisions and clauses set forth in the FARs, as well as several

supplemental terms and provisions set forth in the Defense Acquisition Regulations ("DFARs"), 48 C.F.R. §§201.105, *et seq*.

34.     As a federal contractor, BAE Mayport's right to payment was expressly conditioned on its adherence to the MSMO contract's terms and requirements.  *See generally, United States v. Aerodex, Inc.*, 469 F.2d 1009 (5th Cir. 1972) (recognizing that a federal contractor's knowing failure to meet contract requirements can expose that contractor to liability under the FCA).

## V.     BACKGROUND FACTS

### A.     Mayport Naval Station

35.     Mayport Naval Station is a naval base located in Mayport, Florida, approximately 20 miles from downtown Jacksonville.

36.     Among its various roles, Mayport Naval Station serves as the homeport to four guided-missile cruisers—USS *Philippine Sea*, USS *Gettysburg*, USS *Hue City*, and USS *Vicksburg*—as well as four guided-missile destroyers—USS *Carney*, USS *The Sullivans*, USS *Roosevelt,* and USS *Farragut*.

37.     These cruisers and destroyers spend the majority of their time deployed away from their homeport.

38.     When one of these ships returns to Mayport Naval Station, one of the Navy's top priorities is making sure that necessary repairs, maintenance, and upgrades are performed.  Such repairs and maintenance range from the mundane—*e.g.*, fixing a clogged toilet—to complicated structural repairs that require putting the ship in dry-dock.

39.     Rather than performing these repairs and maintenance itself, the Navy contracts the work to a private contractor, pursuant to a MSMO contract covering all eight ships, plus visiting cruisers and destroyers.

40.     Other ships home-ported at Mayport Naval Station, including several frigates and coastal patrol ships, are not included in the MSMO contract.

41.     From the fall of 2010 through the present, the MSMO prime contractor at Mayport Naval Station has been Defendant BAE Mayport.

**B.     The MSMO Contract and BAE Mayport's Teaming Agreement with the Subcontractor Defendants**

42.     In 2009, the Navy's Naval Sea Systems Command ("NAVSEA") issued Solicitation Number N00024-09-R4412, soliciting bids for the Mayport MSMO contract.

43.     This solicitation prompted Atlantic Marine Mayport LLC—the predecessor of BAE Mayport[1]—to enter into negotiations with Earl, North Florida Shipyards, and QED, regarding cooperation between those four companies.

44.     These four companies were all experienced naval contractors with an established presence in the Jacksonville area.

45.     On October 5, 2009, the four companies entered into a "Teaming Agreement" with respect to both bidding on the MSMO contract and the division of work between them in the event of a successful bid.

46.     Under the terms of the Teaming Agreement, Atlantic Marine Mayport and North Florida Systems would both submit bids on Solicitation Number N00024-09-R4412, while Earl and QED would not.

---

[1]     BAE purchased Atlantic Marine Mayport and changed its name to BAE Systems Southeast Shipyards Mayport LLC in or around July of 2010.

47.     The agreement also called for Atlantic Marine and North Florida Shipyards to each name the other three entities as critical subcontractors in their respective bids.

48.     In the event that either Atlantic Marine or North Florida Shipyards was awarded the prime MSMO contract, the Teaming Agreement established a "work split objective" for production work, divided as follows:

> a. <u>Atlantic Marine</u> – 30% of total contract value, exclusive of specification writing and drydock work;
>
> b. <u>North Florida Shipyards</u> – 20% of total contract value, exclusive of specification writing and drydock work;
>
> c. <u>Earl Industries</u> – 40% of total contract value, exclusive of specification writing and drydock work;
>
> d. <u>QED</u> – 10% of total contract value, excluding drydock work, plus 100% of specification writing.

49.     Under the Teaming Agreement, the prime contractor had the power to vary the above percentages in certain circumstances, including when the designated party is unable to timely, efficiently, or properly perform the work required.

50.     On September 13, 2010, NAVSEA awarded the Mayport MSMO contract to BAE Mayport—the successor entity to Atlantic Marine Mayport.

51.     Under this MSMO contract, BAE Mayport was responsible for accomplishing "non-scheduled repair and alternation requirements" for homeported and visiting cruisers and destroyers at Mayport Naval Station.

52.     In return, BAE was to be compensated on a cost-plus-fee basis.  Specifically, BAE was to be reimbursed its allowable costs and was also eligible to receive an "award fee"—

based on management and technical performance—and an "incentive fee"—based on cost and scheduling performance.

53.     This contract also incorporated, either explicitly or by reference, a number of standard contract provisions from the FARs.  The United States' willingness to reimburse BAE Mayport for its costs under the MSMO contract was conditioned on BAE's adherence to the requirements of that contract.

54.     Pursuant to 48 C.F.R. §52.216-7 (Dec. 2002),[2] the contract established that the government would make payments as requested as BAE's work progressed, but not "more often than once every 2 weeks, in amounts determined to be allowable by the Contracting Officer in accordance with Federal Acquisition Regulation subpart 31.2 in effect on the date of this contract and the terms of this contract."

55.     As of the date BAE and the government entered into the MSMO contract, FAR Subpart 31.2 provided that an allowable cost must be reasonable, and that "[a] cost is reasonable if, in its nature and amount, it does not exceed that which would be incurred by a prudent person in the conduct of competitive business."  48 C.F.R. §31.201-3(a) (Sept. 2010).

56.     Additionally, FAR Subpart 31.2 provides that when a contractor's accounting practices are inconsistent with the FARs' requirements, "costs resulting from such inconsistent practices in excess of the amount that would have resulted from using practices consistent with this subpart are unallowable."  48 C.F.R. §31.201-2(c) (Sept. 2010).

57.     Pursuant to 48 C.F.R. §52.215-10 (Oct. 1997), if BAE Mayport or any of its subcontractors or prospective subcontractors submitted data of any description that was

---

[2]     Because the FARs are subject to frequent updates, the MSMO contract for Mayport Naval Station identifies the specific version of each FAR provision referenced and incorporated by month and year.

inaccurate and resulted in a significant increase in the amount of reimbursement, then the cost reimbursed by the government was to be reduced accordingly.

58.    Pursuant to 48 C.F.R. §252.215-7002(a)(2), (b) (Dec. 2006), BAE Mayport was required to "establish, maintain, and comply with an accepted estimating system" that produces "verifiable, supportable, and documented cost estimates that are an acceptable basis for negotiation of fair and reasonable prices."

59.    Pursuant to 48 C.F.R. §52.244-5(a) (Dec. 1996), BAE Mayport was required to "select contractors (including suppliers) on a competitive basis to the maximum practical extent consistent with the objectives and requirements of the contract."

60.    In violation of these contract requirements, BAE Mayport has engaged in an ongoing conspiracy and scheme to defraud the United States by working with the subcontractor defendants to rig bids and inflate costs billed to the United States under its MSMO contract.

### C.    Relator's Work Experience at BAE Mayport and his Communications with Federal Investigators

61.    Prior to working for BAE Mayport, Relator had worked for BAE Land & Armaments division in Fairfield, Ohio.

62.    A major part of Relator's job in Fairfield was developing an approved purchasing system, which permits a contractor to operate with more limited government oversight.

63.    During a meeting in Washington D.C. in August 2011, Relator met Brad Moyer, who was then serving as BAE's Director of Supply Chain II for Ship Repair Corporate in Norfolk, Virginia.

64.    During the meeting, Mr. Moyer indicated that he could use an employee with Relator's experience with FARs and purchasing systems to assist the company's newly acquired

ship repair facility in Mayport obtain purchasing system approval from the Defense Contract Management Agency.

65.     After several weeks of back and forth negotiations and an interview in Mayport, Relator was hired as a Purchasing Manager with responsibility for: (1) segregating the Mayport procurement operations from the commercial procurement operations at BAE Jacksonville; (2) hiring and training Mayport procurement staff; (3) integrating procurement and warehouse operations at Mayport; (4) integrating material and subcontract estimating with Procurement operations; and (5) developing and implementing a procurement manual.

66.      Despite the promises made to Relator by BAE and Brad Moyer's stated interest in developing an approved purchasing system, Relator was hamstrung in his efforts from the moment he arrived at BAE Mayport.

67.     As detailed in following sections of this complaint, Relator found that BAE Mayport's purchasing system had no meaningful safeguards or record-keeping requirements to ensure that the costs being passed along to the United States were reasonable.  In the absence of such safeguards, BAE Mayport regularly billed for unreasonable and non-competitive costs to the United States.

68.     Additionally, Relator found that BAE Mayport—as the successor to Atlantic Marine Mayport—was using its Teaming Agreement with Earl, North Florida Shipyards, and QED as cover for rigging bids and submitting inflated cost estimates to the United States, which resulted in inflated payments being made to BAE Mayport by the United States.

69.     During the course of his employment, Relator repeatedly raised and attempted to remedy the improprieties he uncovered in this purchasing system.  However, every attempt by

Relator to bring this purchasing system into compliance with federal law was stymied and undone by his superiors.  Ultimately, Relator was terminated in retaliation for these efforts.

70.     After approximately one year of trying to address these issues internally, Relator submitted a Defense Hotline Complaint Form to the Department of Defense Office of the Inspector General ("DoD OIG") on March 28, 2013, setting forth BAE Mayport's fraudulent schemes to overcharge the United States under its MSMO contract.

71.     Since that time, Relator has been in repeated contact with DoD OIG, disclosed significant amounts of information, and turned over significant numbers of documents. Accordingly, Relator constitutes an original source for the claims in this complaint pursuant to 31 U.S.C. §3730(e)(4).

## VI.   DEFENDANTS' SCHEMES TO DEFRAUD THE UNITED STATES

### A.   BAE Mayport Knowingly Refuses to Establish an Acceptable Estimating System

#### i.     In General

72.     Under its MSMO contract, BAE Mayport was required to "establish, maintain, and comply with an accepted estimating system" that produces "verifiable, supportable, and documented cost estimates that are an acceptable basis for negotiation of fair and reasonable prices." 48 C.F.R. §252.215-7002(a)(2), (b) (Dec. 2006).

73.     At no point during Relator's time at BAE Mayport did the company come close to complying with this requirement.  As a result, BAE Mayport regularly generated inflated, non-competitive cost estimates that served as the basis for fraudulently inflated, non-competitive invoices that BAE Mayport submitted for payment to the United States for ship repair work performed under the MSMO contract.

74.     When he arrived in late 2011, Relator found that BAE Mayport's procurement staff was rubber-stamping requisition requests created in the SREP System without performing any independent price analysis.

75.     The SREP System—short for Ship Repair Electronic Procurement—was BAE Mayport's master database for creating and tracking requisitions, purchase orders, invoices, and supporting documentation and data.

76.     The lifecycle of an SREP entry for any particular task would typically begin with a requisition, which provided notice to the procurement department that particular materials and/or labor needed to be ordered.

77.     Various types of BAE employees were able to access SREP to create requisitions, including employees in the purchasing and crafts departments, as well as estimators, ship superintendents, and warehouse personnel.

78.     Each requisition would include a request for both labor and materials, as appropriate.

79.     In most instances, the requisitions would specify a particular subcontractor—*e.g.*, requesting 20 hours of labor from Earl—without stating any basis for awarding the work to that contractor and without first determining the cost to perform the work internally.

80.     In a well-organized purchasing system, the generation of a requisition will prompt a review by one or more employees within the Purchasing Department.

81.     If the requisition is for services that can be provided internally, by the prime contractor, then one employee, the estimator, will independently estimate the cost of providing that service.  At the same time, a second individual, the subcontract manager, will solicit quotes from suppliers to determine the cost of subcontracting for the labor.  The estimator and

subcontract manager will then compare their respective numbers to determine the most cost effective way to fill the requisition.  This is known as the "make or buy" process.

82.     If the labor described in the requisition is not something that the contractor can provide internally, then the subcontract negotiator will still solicit quotes and compare prices, but without any meaningful involvement by the estimator.

83.     Unlike the model described above, the procurement agents at BAE Mayport would typically generate purchase orders that fulfilled the requisitions exactly as written, without making any determination of whether the labor or materials could be obtained at lower cost from another source.

84.     Additionally, there was no separation between the internal estimators and subcontract negotiators. When Relator arrived at BAE Mayport, he found that Estimators—who were not even within the purchasing department—were performing both roles simultaneously, leaving the subcontract negotiators and buyers within the purchasing department with nothing more than the administrative role of converting requisitions into purchase orders.  Specifically, the Estimators, or sometimes craft workers or project managers with SREP access, would make the decision about whether to fill the requisition internally or to subcontract it, as well the decision of which subcontractor to use.

85.     This meant that the same individuals responsible for soliciting bids from subcontractors were responsible for determining whether and at what price BAE Mayport could perform the work internally, which created opportunities for BAE Mayport to inflate its internal estimates based on the estimators' knowledge of what subcontractors were charging for the same work.

ii.     **Relator Attempts to Fix Problems with Purchasing System, But is Prevented from Doing So by His Managers at BAE Mayport**

86.     When Relator began working at BAE Mayport, he understood his primary job responsibility to be restructuring the BAE Mayport purchasing system in order to obtain approval for that system by the Defense Contract Management Agency.  Such approval would allow BAE Mayport to operate as MSMO prime contractor with less direct oversight from the government.

87.     From the very beginning, however, Relator's superiors at the Mayport facility made clear that they were hostile to his efforts and had no interest in submitting their purchasing systems to proper price controls or meaningful competition.

88.     On February 15, 2012, Relator was invited by BAE Mayport's Director of Contracts, Catherine Palmer, to attend one of her weekly meetings with the Administrative Contracting Office (ACO) for the Navy's Southeast Regional Maintenance Center ("SERMC"), Jose Marin.

89.     At this meeting, Ms. Palmer and Relator explained to Officer Marin that BAE Mayport's common practice was to award contract work on a "single source" basis rather than competing it, though they did not necessarily endorse that practice.

90.     Officer Marin expressed his displeasure at this, and was particularly irritated to learn that BAE Mayport had been single-sourcing its Expanded Process Control Procedure (EPCP) drafting work to a company called Gibbs & Cox, rather than competing it.

91.     As a result of this meeting, Ms. Palmer began soliciting quotes from other EPCP subcontractors, rather than simply sending all such work to Gibbs & Cox.

92.     Later, however, at a BAE Progress Analysis Meeting, Deputy Program Manager Pete Cavasino explained to the managers in attendance that Ms. Palmer had begun to compete some of the EPCP work, and that she had met with Officer Marin and Relator on this issue.

93.     Upon hearing this, Vince Stammetti, the Director and General Manager for BAE Jacksonville and BAE Mayport, began cursing, saying that "no dumb f[expletive]ing Hispanic who does not know s[expletive]" would tell him how to run his business.  Mr. Stammetti also called Ms. Palmer a "f[expletive]ing b[expletive]" and made clear that he would "have the ass" of anyone went against his instructions to single-source EPCP work with Gibbs & Cox.

94.     Relator was not physically in attendance at this Progress and Analysis Meeting, but was participating by phone and accordingly heard all of Mr. Stammetti's comments directed at him and at Ms. Palmer.

95.     Several weeks later, Ms. Palmer was terminated from her position.

96.     Even after this incident, Relator still worked diligently to fix the deep structural problems with BAE Mayport's purchasing system.

97.     One of the proposals that Relator submitted to his managers was restructuring the Purchasing Department to add greater accountability and oversight.

98.     Specifically, he proposed moving the estimators, who at that time were part of the Contracts Department, to the purchasing department under Relator's supervision.

99.     Relator's managers not only rejected these proposals, they reorganized the departments on July 30, 2012 to take away most of Relator's remaining oversight duties. Specifically, the estimators were moved to the Planning Department rather than Purchasing, and the subcontract administrators who had previously reported to Relator were moved to the Contracts Department.

100.    As a result of this reorganization, Relator was left with only two direct reports, a senior buyer and the Supervisor of Materials (*i.e.* the head of the warehouse).

### iii.    Internal Audit of Estimating and Purchasing Systems

101.    Due to the hostility Relator faced from his managers in Mayport, Relator also reached out during this period to officials at BAE Ship Repair's North American corporate headquarters in Norfolk, Virginia.

102.    As a result of Relator's communications, corporate leadership made the decision to send an internal auditor named Kenwyn Baptiste to audit BAE Mayport's purchasing system.

103.    Mr. Baptiste was on-site from May 29, 2012 to June 1, 2012 and reviewed purchasing orders and supply agreements with Relator's assistance and cooperation.

104.    On June 19, 2012, Mr. Baptiste submitted his report to Jamie McPhee, Director of Finance for Ship Repair, Brad Moyer, Director of Purchasing for Ship Repair, and Sandra Morgan, Purchasing Manager, all of whom were based in Norfolk.  Mr. Baptiste also submitted a courtesy copy to Relator a few weeks later.  A copy of this audit report is attached hereto as Sealed Exhibit 1.

105.    Mr. Baptiste's audit report confirmed all of Relator's prior comments and concerns regarding the systemic failures BAE Mayport's purchasing system.

106.    Among his many findings, Mr. Baptiste's audit report concluded that:

   a.  "No price analysis is being done, for orders over $3k."
   b.  "Buyers have been told to use PO [purchase order] justification in SREP, but this is not being done correctly and sometimes not at all."
   c.  "Written request for quote (RFQ) not part of the PO record for orders over $25K."
   d.  "Not doing non-competitive award justification."

107.    Mr. Baptiste also noted the following defects, with respect to 16 subcontract purchase orders he had audited:

a. "No requisition printed."
b. "No request for proposal (RFQ) (Estimating Dept issues and receives all quotes)"
c. "No price analysis done due to not having quotes"
d. "Source selection explanation not done (Estimating does all source selection)"

108.   Based on these serious deficiencies, Mr. Baptiste recommended a number of steps that BAE Mayport needed to take to bring its purchasing system into compliance.  Most notably, Mr. Baptiste stated that "Purchasing has no input in source selection process, purchasing should be the lead with input from estimating and PM's."

109.   Despite Mr. Baptiste's audit report and recommendations, BAE Mayport never took any steps to implement any of his proposals.

110.   Dave Jonis, Relator's direct supervisor and the BAE Jacksonville Procurement Manager, was at least aware of the audit, as Mr. Jonis sent Relator an email at one point emphasizing that Relator worked for him and admonishing Relator not to talk to Norfolk (*i.e.* managers in BAE Ship Repair's corporate office in Norfolk, Virginia).

**B.   BAE Mayport Conspires with Subcontractors to Rig Bids and Overcharge the United States**

    **i.   General Scheme**

111.   These major, systemic failures in BAE Mayport's purchasing system had much larger consequences than just inefficiency and poor documentation.

112.   The lack of proper estimating, pricing, and contract management also created cover for BAE Mayport to either keep work for itself or to source work to its preferred contractors without any true regard for whether the costs being submitted to the Navy were reasonable.

113.   The MSMO contract expressly recognized the central role that a contractor's estimating and accounting system plays in controlling costs.   Specifically, the contract

incorporated FAR 31.201-2(c), which establishes that "costs resulting from such inconsistent [accounting] practices in excess of the amount that would have resulted from using practices consistent with this subpart are unallowable."  48 C.F.R. §31.201-2(c) (Sept. 2010).

114.    Despite these express provisions, BAE Mayport knowingly and consistently awarded work to subcontractors without engaging in any meaningful bidding, and without any meaningful cost controls, which resulted in the submission of invoices to the United States for unreasonable and inflated costs, in direct violation of the MSMO contract and its conditions of payment.

115.    As the successor to Atlantic Marine Mayport, BAE Mayport assumed Atlantic's place in the four-way Teaming Agreement with Earl, North Florida Shipyards, and QED, and has consistently followed the terms of that agreement in its role as prime MSMO contractor at Mayport Naval Station.

116.    Under the Federal Acquisition Regulations, teaming agreements are not necessarily unlawful.  In fact, the FARs recognize that such arrangements can be beneficial to the government in certain circumstances and may offer the "best combination of performance, cost, and delivery for the system or product being acquired."  48 C.F.R. §9.602(a).

117.    However, the FARs are equally clear that the existence of a teaming agreement does not excuse violations of federal anti-trust statutes or limit the Government's right to "pursue its policies on competitive contracting, subcontracting, and component breakout after initial production or at any other time."  48 C.F.R. §9.604(d).

118.    Here, in violation of both the MSMO contract and federal False Claims Act, BAE Mayport and the Subcontractor Defendants have knowingly and deliberately inflated costs and restricted competition in performing maintenance and repair work under the MSMO contract.

119.    BAE Mayport may have internally justified some of these subcontract awards on the basis of the MSMO Contract's requirement that BAE Mayport award 40% of the work under the contract to small business entities.    Specifically, Relator knows that BAE Mayport considered Earl Industries a small business for purposes of its MSMO requirements.    However, as described in greater detail elsewhere in this complaint, BAE Mayport had actual knowledge by no later than the first quarter of 2012 that Earl did not meet the legal definition of a small business entity.

120.    Because the MSMO contract compensates BAE Mayport for its incurred costs, these inflated costs and rigged bids have necessarily resulted in the submission of false claims for payment to the United States, as well as financial harm to the United States.

ii.    **Specific Example of Bid Rigging—Repair and Maintenance Work on the USS *Hue  City***

121.    Throughout the period that Relator worked for BAE Mayport, it was the company's practice to divide up ship repair and maintenance work between itself, Earl, North Florida Shipyards, and QED, with little to no consideration for the ultimate cost to the United States.

122.    On various different occasions during his employment at BAE Mayport, Relator attempted to compete work more broadly.    Specifically, he suggested that BAE Mayport solicit quotes from Main Industries and George Sharp, two companies with a presence in the Jacksonville area that Relator knew were capable of performing much of the needed maintenance work.    However, BAE Mayport's management repeatedly directed Relator and other employees not to include Main Industries or George Sharp when sending out requests for quotes.

123.    For example, as part of his duties, Relator performed an internal review of Job 64101, which involved various repair and maintenance tasks for the USS *Hue City* while it was in port in December of 2011.

124.    Relator found that BAE Mayport had not followed any real estimating procedures and had not made any formal request for bids.

125.    Instead, BAE Mayport sent requests only to Earl, North Florida Shipyards, and QED.  Of the three, Earl was the only one that responded to the solicitation and submitted bids.

126.    For at least two items, Relator discovered that Earl had been awarded work despite the fact that its bid was higher than BAE Mayport's internal estimate for that same work. Specifically, Earl was awarded item #110-01-001 on Purchase Order 6810019 for $45,954.00 when BAE Mayport's internal estimate for that same work was $36,455.00.  Similarly, Earl was awarded item #512-11-001 on Purchase Order 6810024 for $62,223.00 when BAE Mayport's internal estimate for that same work was $20,171.00.  A copy of the chart showing these awards is attached hereto as Sealed Exhibit 2.

127.    In a subsequent repair and maintenance job for the USS *Hue City*, in March of 2012, representatives of Earl, BAE Mayport, and North Florida Shipyards actually held an in-person meeting to share their respective cost estimates and decide how to divide up the work. The meeting was held on March 29, 2012.  Relator personally attended this meeting and personally observed BAE Mayport and the Subcontractor Defendants colluding.  Also in attendance for BAE Mayport were Dennis Stokowski, BAE Mayport's MSMO Program Manager, and Pete Cavasino, BAE Mayport's Deputy Program Director for MSMO.

128.    By that point, BAE Mayport had already been in discussions with the Southeast Repair and Maintenance Center ("SERMC")—the Navy entity responsible for managing and

budgeting for ship repair work at Mayport—and had a list of work that needed to be performed on the *Hue City.*

129.    Prior to the March 29, 2012 meeting, BAE Mayport had distributed this list to Earl and North Florida Shipyards and asked each company to submit estimates on every specific work item they were interested in performing.   A copy of these internally distributed cost estimates is attached hereto as Sealed Exhibit 3.

130.    At the meeting itself, Mr. Stokowski and Mr. Cavasino distributed a spreadsheet showing a side-by-side comparison of each company's estimated costs on each work item. Relator objected to this practice and pointed out that such sharing of cost-data violated both Procurement Integrity rules and the FARs, but his comments were ignored.

131.    With the relative cost estimates in front of them, the representatives from BAE Mayport, Earl, and North Florida Shipyards proceeded to discuss which entity wanted to perform which work items.

132.    As the prime contractor, BAE Mayport then made formal assignments of work based on the discussions during that meeting.   Accordingly, BAE Mayport knowingly violated the MSMO contract's explicit requirement that repair work be subcontracted on a competitive basis to the maximum practical extent.

### iii.    Other Examples of Bid Rigging

133.    On April 12, 2012, at a BAE Mayport Production Meeting, Deputy Program Manager Cavasino explained to Relator and other employees in attendance that the company was preparing to meet with its subcontractors and share cost data related to the USS *Carney*, which was returning to port, in the same way as the company had done with respect to the USS *Hue City.*   Relator again expressed his concern that this practice violated Procurement Integrity

requirements and the FARs, but he was once again ignored. Additionally, in light of his criticisms, Relator was not invited to attend the actual meeting with representatives from the subcontractors.

134.   At another meeting, on May 15, 2012, Deputy Program Manager Cavasino explained to BAE Mayport Program Managers that pursuant to the Teaming Agreement, BAE Mayport was to carve out no more than 30% of the MSMO repair and maintenance work for itself, and was to divide the rest between Earl and North Florida Shipyards, based on which of the two submitted the lower bid. Program managers were specifically instructed to subcontract this 70% of the work regardless of whether BAE was able to perform specific work items itself at a lower cost.

135.   At that meeting, Deputy Program Manager Cavasino further explained that for any specific work item, if only one subcontracting bid was received (*i.e.*, either Earl or North Florida Shipyards declined to submit a bid), it was then acceptable to compare the external quote (*i.e.,* the quote from Earl or North Florida Shipyards) to BAE Mayport's internal cost estimate and award the work to the lower cost-entity.

136.   On May 24, 2012, various BAE Mayport managers, including Relator, met to discuss upcoming repair and maintenance work on USS *The Sullivans*, which was scheduled to be back in port in the near future.

137.   Much of the scheduled work for *The Sullivans* had originally been awarded to North Florida Shipyards. However, North Florida Shipyards later withdrew its bid, and BAE Mayport transferred the work to Earl.

138.    At the planning meeting, Relator asked how BAE Mayport was justifying the award to Earl, and was initially told that it was being justified based on an analysis of North Florida Shipyards' initial bids and on BAE Mayport's own internal estimates.

139.    Relator pointed out that neither set of estimates was a valid basis to justify the award to Earl, given that North Florida Shipyards had withdrawn its bid and that BAE's estimates were prepared by estimators who had also solicited bids from Earl and North Florida and accordingly had access to their cost data in the course of preparing BAE Mayport's internal estimates.

140.    When Relator pressed on this point, Senior Estimator Mike Cook told Relator that he had been instructed to give the work to Earl in order to maintain the work distribution percentages spelled out in the Teaming Agreement.

### iv.    BAE Mayport Knowingly Fails to Maintain Required Documentation

141.    In addition to these examples of collusion and bid rigging between BAE Mayport and the Subcontractor Defendants, Relator was also regularly instructed to process and approve purchase orders for work performed by Subcontractor Defendants that lacked any documentation establishing the reasonableness of the work or the nature of the work being billed.

142.    For example, Purchase Order No. 57PO5908 was issued to Earl Industries for two welders at a flat rate of $8,500, with no description of hours to be worked, hourly rates, or even a statement of the work to be performed.

143.    Based on Relator's concerns that purchase orders were not being properly documented, he spent several hours on July 5, 2012 personally reviewing subcontractor purchase order justifications in the SREP system that subcontract administrators had prepared over the previous month.  Of the approximately 150 records that he reviewed, Relator found that around

80% of them contained no data to justify the purchase order.  Relator further found that of these 80%, approximately half were purchase orders for payments to Earl.

144.    At a meeting called by Dale O'Bar, Contracts Manager, on September 18, 2012 Mayport Management and Subcontract Administrators were asked to sort out over $1 million in cost overruns associated with the MSMO contract since its inception. The intent was to submit these costs to the Navy as "New Conditions Found" in order to get reimbursed under the contract. After an hour of going over the Contract Status Schedule Reports (CSSR) and other financial spreadsheets/reports it was decided by Joe Kudashick, BAEM Director of Operations, to adjourn the meeting due to the numbers not tying between the different reports and reconvene at a later date.

145.    Relator indicated at this meeting that many of the cost overruns were associated with Purchase Price Variance (PPV) issues caused by the buyer placing purchase orders for a higher price than originally quoted by the suppliers and agreed to with the Navy.  Accordingly, these costs should not have been recoverable under the contract.

### v.    BAE Mayport Fraudulently Subcontracts Work to BAE Jacksonville on a Single-Source Basis

146.    While BAE Mayport was farming most of the repair and maintenance work under the MSMO contract to Earl, North Florida Shipyards, and QED, one type of work that it never sent to its Team Agreement partners was dry-docking work.

147.    Instead, BAE Mayport subcontracted all dry dock work to BAE's commercial shipyard in Jacksonville, which was operated by Defendant BAE Systems Southeast Shipyards, AMHC, Inc. ("BAEJ"), on a sole source basis.

148.    BAEJ did, in fact, operate the only nearby dry dock, so it was reasonable to subcontract dry-dock work with BAEJ as a sole source supplier, rather than competing the work.

149.    The problem with this relationship was that BAE Mayport was awarding work to BAEJ as a subcontractor at the same time that BAEJ had ultimate operational control over BAE Mayport.

150.    Vince Stammetti was the Director and General Manager for both the Jacksonville and Mayport facilities, and Dave Jonis, Procurement Director for BAE Jacksonville, had oversight authority over Relator in Relator's role as Purchasing Manager for BAE Mayport.

151.    Combined with BAE Mayport's lack of proper estimating procedures, this organizational overlap with BAEJ created a huge conflict of interest and led to a complete lack of cost controls.

152.    Additionally, due to the relationship between BAE Mayport and BAEJ, BAE Mayport would often subcontract work unrelated to the actual dry-docking to BAEJ, rather than competing that work.

153.    For example, the USS *Carney* was dry-docked in mid-2012 for approximately three months.  During that time, BAE Mayport subcontracted many tasks unrelated to the dry-docking to BAEJ that should have been sourced on a competitive basis.  Relator knows specifically that BAE Mayport subcontracted the installation of a ballistic missile to BAEJ on a single-source basis that should have been bid competitively.

**C.    BAE Mayport Knowingly Bills the United States for Goods and Services From Impermissible Subcontractors**

154.    In addition to the general requirement that BAE Mayport select subcontractors on a competitive basis to the maximum degree possible, 48 C.F.R. §52.244-5(a) (Dec. 1996), the MSMO contract also provided several specific subcontracting requirements that BAE was required to follow.

155.    First, the contract made clear that BAE Mayport could not subcontract with entities that had been "debarred, suspended, or proposed for derbarrment," without first providing written notice to the naval Contracting Officer.  FAR 52.209-6 (Sept. 2006).  The only exception to this requirement was for "commercially available off-the-shelf items."

156.    Second, the contract made clear that BAE Mayport was required to subcontract 40% of its direct costs related to production work to small business concerns—subject to a few minor carve outs for subcontracts for "execution planning efforts."

157.    During the period that Relator worked at BAE Mayport, BAE Mayport regularly violated both of these requirements.

### i.    BAE Mayport Regularly Subcontracts with non-approved and debarred subcontractors

158.    During the period that Relator worked there, BAE Mayport failed to perform even cursory checks on whether it was subcontracting work to impermissible subcontractors, in violation of the express conditions of payment in the MSMO contract.

159.    Under FAR 52.209-6(c) (Sept. 2006), which was incorporated into the MSMO, BAE Mayport was required, at a minimum, to "require each proposed subcontractor whose subcontract will exceed $30,000, other than a subcontractor providing a commercially available off-the-shelf item, to disclose to the Contractor in writing, whether as of the time of award of the subcontract, the subcontractor, or its principals, is or is not debarred, suspended, or proposed for debarment by the Federal Government."

160.    Under that same FAR, BAE Mayport was also required to notify the Navy's Contracting Officer, in writing, before entering into a subcontract with any entity debarred, suspended, or proposed for debarment, except where the subcontract was purely for commercially available off-the-shelf items.  *Id.* 52.209-6(d) (Sept. 2006).  This written notice

was required to provide, *inter alia*, the "compelling reason(s) for doing business with the subcontractor notwithstanding its inclusion in the Excluded Parties List System."

161.    Despite this explicit requirement, BAE Mayport never required its subcontractors to make any certification and never conducted any independent check on whether its subcontractors were debarred, suspended, or proposed for debarment by the federal government, despite the fact that this information was being maintained online by the federal government in its Excluded Parties List System (ELPS), and was therefore readily accessible by BAE Mayport.

162.    Instead, BAE Mayport selected subcontractors based on an Appoved Supplier List maintained by BAE Mobile, a BAE commercial facility in Mobile, Alabama, with little to no experience managing governmental contracts.

163.    As early as June 28, 2012, Relator communicated his concerns to Dave Jonis via email that the Approved Supplier List was not up to date, and that some of the suppliers approved by BAE were not actually approved by the United States.  But Mr. Jonis and the other managers at BAE Mayport ignored Relator's concerns.

164.    Relator again raised his concerns in a meeting agenda he circulated on or about October 16, 2012.   In this meeting agenda, Relator specifically noted that "[a]pproved supplier/subcontractor data base not being properly maintained to meet the needs of Mayport," and that "[the] Excluded Parties List System (EPLS) [was] not being checked prior to issuing a quote or a PO to a supplier."   However, Relator's concerns and recommendations were again ignored.

165.    The independent audit conducted by Kenwyn Baptiste in May and June of 2012 confirmed Relator's allegations.

166.    For both his audit of material purchase orders and his audit of subcontract purchase orders, Mr. Baptiste found that there were "no reps and certs enclosed" and "no EPLS."

167.    Through internal sweeps and reviews of BAE Mayport's purchasing data that Relator conducted during his employment, Relator was able to confirm that BAE Mayport actually subcontracted with certain entities who had been debarred or proposed for debarment by the federal government.

168.    By failing to require certification from its subcontractors, failing to independently verify that its subcontractors were eligible to participate in contracts with the federal government, and by actually subcontracting with ineligible companies and billing the cost to the United States, BAE Mayport submitted false and fraudulent claims, as well as false and fraudulent claims information to the United States that was material to the United States' decisions to reimburse those claims.

ii.      **BAE Mayport Knowingly Violated its Obligation to Subcontract Forty Percent of the Work Under the Contract to Small Business Concerns**

169.    Under the express terms of its MSMO contract, BAE Mayport was required to subcontract 40% of its direct costs, minus a few narrowly defined carve outs, to small business concerns.

170.    The contract permitted BAE Mayport to satisfy this 40% requirement "either directly or indirectly," but made clear that it was not permitted to tier profits or fees from its subcontractors—*i.e.* seek reimbursement from the United States for fees from a subcontractor who did nothing but further subcontract the work to another entity.

171.    Moreover, the MSMO explicitly stated that the "failure of the Contractor to comply in good faith with this clause shall be considered a material breach of the contract."  In

other words, by its own express terms, adherence to this provision was a condition of payment under the MSMO contract.

172.   During the time that Relator worked for BAE Mayport, Relator personally observed regular violations of this requirement, mostly relating to BAE Mayport's business relationship with Earl Industries.

173.   At the time BAE Mayport's predecessor entered into its Teaming Agreement with Earl, North Florida Shipyards, and QED, the apparent plan was to satisfy the small business requirement predominately through the subcontracting of work to Earl.  In fact, the specific share of work reserved for Earl under the Teaming Agreement (40%) was likely chosen in order to ensure that the parties satisfied the MSMO small business requirement.

174.   At the time the parties entered into the Teaming Agreement, this arrangement made sense, as Earl did in fact meet the regulatory definition of small business concern.

175.   However, at some point between late 2010, when the parties entered into their Teaming Agreement, and the beginning of 2012, Earl ceased to qualify as a small business concern for purposes of the MSMO contract.

176.   Relator learned of this fact in the first quarter of 2012, when he and one of his direct reports, Subcontract Administrator Leigh Anderson, were tasked with compiling and analyzing the small business subcontracting numbers that BAE Mayport planned to submit for the Award Fee Board.  The Award Fee Board was the entity responsible for determining whether BAE Mayport was eligible for any completion or performance bonuses under the MSMO.

177.   Ms. Anderson brought it to Relator's attention that BAE Mayport was continuing to identify Earl as a small business concern, despite the fact that it no longer met the regulatory

definition.  Ms. Anderson, with Relator's knowledge and approval, accordingly revised her small business subcontracting numbers to omit subcontract awards to Earl.

178.    Ms. Anderson also brought this issue to the attention of other managers at BAE Mayport, including Dale O'Bar, Director of Contracts.

179.    Director O'Bar demanded that Ms. Anderson put the Earl subcontract awards back into her analysis, which resulted in a significant increase in the percentage of work that BAE Mayport reported to the Fee Award Board as having been subcontracted to small business entities.

180.    Additionally, Relator is aware that at least some of the work subcontracted to Earl was further subcontracted to other companies, some of whom were themselves small business concerns.  In those instances, BAE Mayport often double counted this subcontracted work—once for Earl and once for Earl's subcontractor—for purposes of reporting small business subcontracting to the United States.

181.    Later on, Kenwyn Baptiste's audit in May and June 2012 largely confirmed that BAE Mayport was not making good faith efforts to subcontract work to small business concerns, noting "small business check list there is no evidence that this is being done."

182.    Given that good faith compliance with the small business concern subcontracting clause was an express requirement for payment under the MSMO contract, BAE Mayport's knowing and deliberate efforts to submit false and fraudulent subcontracting data caused the United States to pay money to BAE Mayport that it would not otherwise have paid.

**D.      BAE Mayport Knowingly Overcharges the United States for Materials and Other Indirect Costs**

183.    At the same time that BAE Mayport was conspiring with Earl, North Florida Shipyards, and QED to rig bids and submit inflated costs for repair and maintenance work, BAE

Mayport was also defrauding the United States through the knowing submission of claims for inflated material and indirect costs.

184.    As with labor costs, the FARs provide that the United States will only pay material costs that are "reasonable . . . in its nature and amount." 48 C.F.R. §31.201-3(a).  The FARs further provide that one important consideration of whether a particular cost is reasonable is if it is based on "[g]enerally accepted sound business practices, arm's length bargaining, and Federal and State laws and regulations."  *Id.*

185.    When Relator took his position at BAE Mayport, he found that the buyers in the materials department were no more willing to bid for materials or manage costs than the subcontract managers and estimators were for repair and maintenance work.

186.    Because BAE Mayport was reimbursed by the United States for its costs, this knowing failure to manage material costs resulted in significant overcharges to the United States.

**i.      Specific Examples of Fraudulently Inflated Material and Indirect Costs Billed to the United States**

187.    In December 2012, Relator learned that materials buyer Fran Estes regularly placed material orders with a local company called Hagemeyer.  Ms. Estes placed these orders without ever sending requests for a quote to either Hagemeyer or any other supplier, resulting in a complete lack of competition.

188.    When Relator questioned Ms. Estes about this practice, she explained that there was an agreement in place between BAE and Hagemeyer based on a catalog of pricing information that Hagemeyer had originally provided to Atlantic Marine in 2008 and updated annually every year since.

189.    Relator looked into this matter personally and found that the agreement with Hagemeyer had expired, but that BAE continued to purchase parts from Hagemeyer using its annually-updated catalog prices, without engaging in any price competition.

190.    Relator ultimately placed a call to Neil Hallman, a sales representative at Hagemeyer, to seek clarification regarding the relationship between the two companies.  Mr. Hallman confirmed that Hagemeyer and BAE Mayport continued to do business pursuant to the expired agreement and based upon the prices set forth in the catalog, and that BAE Mayport never submitted requests for a quote.  Additionally, Mr. Hallman noted that he was a good friend of Dave Jonis, the BAE Jacksonville Procurement Manager and Relator's immediate supervisor at the time.

191.    Based in part on her failure to conduct any kind of cost analysis or submit requests for quotes, Relator gave Ms. Estes a mediocre performance rating that year– a 3 on a scale of 5 – and recommended only a 2.5% increase in salary.

192.    On January 20, 2013, Dave Jonis directed Relator to increase Ms. Estes' performance rating to a 5, to promote her from a level 09 to a level 10 employee, and to give her a 10% salary increase.

193.    Another, more egregious example of such inflated pricing relates to the purchasing of watertight doors for USS *The Sullivans* in June and July of 2012.

194.    Several months after these two doors had been ordered, Relator had occasion to research their purchasing history, in an attempt to resolve a possible missed delivery deadline.

195.    In researching the purchase history on these two doors, Relator uncovered that BAE Mayport had submitted a bid to the government well above what the supplier had actually quoted BAE.

196.     Specifically, Relator found an email quote from the supplier, Pacific Ship Repair and Fabrication, dated June 29, 2012, offering to sell one of the doors (identified as item 167-11-001) for $6,625.00 and the other (identified as item 167-11-002) for $7,825.00.

197.     BAE Mayport then submitted a request for approval to SERMC, quoting unit prices of $6,725.00 and $8,175.00, respectively, which SERMC authorized by letter dated July 17, 2012.   These quoted unit prices were $100 and $350 more expensive than the unit prices Pacific Ship Repair and Fabrication had actually quoted to BAE Mayport.

198.     Relator further discovered that BAE Mayport created a revised purchasing order, PO #57P11753, stating unit costs for the same two doors of $9,289.00 and $9,529.00.   These increased costs supposedly resulted from an "expediting cost" to have the items ready in 6-8 weeks, rather than 8-10 weeks.   There was no evidence of a revised quote or of any other documentation in the file to support these revised prices.

199.     Moreover, the file reflected that Pacific Ship Repair had not actually delivered the two doors within the expedited time frame, but that BAE Mayport paid the expediting costs pursuant to PO #57P11753 anyway and then submitted these costs to the Navy for reimbursement.

200.     A Copy of some of the underlying documentation reflecting these price mark-ups is attached hereto as Sealed Exhibit 4.

201.     In addition to these straight-forward mark-ups, Relator's review of the purchasing history showed no evidence of BAE Mayport having engaged in any type of bidding or other cost controls for these materials.

202.    Additionally, BAE Mayport regularly awarded jobs to suppliers without going through the procurement system at all, and then directed the Procurement Department to create a purchase order after the fact.

203.    For example, Joe Kudashick, Director of Operations for BAE Mayport, submitted a $24,489.77 invoice from InSync Consulting dated April 24, 2012 for two "Excelerated" coaching packages (*i.e.* leadership training) and related costs.   Director Kudashick told the Procurement Department to process and pay it.

204.    Upon researching the invoice, Relator discovered that there was no requisition or purchase order in the system related to this invoice.

205.    In order to pay the invoice, the SREP system requires the existence of a purchase order.

206.    While Relator was not willing to create a retroactive purchase order, another employee within the Procurement Department, who was concerned for that employee's job, did ultimately create the backdated purchase order and pay the invoice, at the direction of General Manager Vince Stammetti, and this invoice was ultimately submitted to the United States for reimbursement.

ii.     **BAE Mayport – in addition to other BAE entities – deliberately overcharges for Indirect Material costs as part of a broader kickback scheme between BAE Systems, Xchanging, and Grainger**

207.    In addition to the specific examples and policies described above, Relator learned of a much broader scheme to defraud the government through the submission of inflated claims for maintenance, repair, and overhead items – items such as nails, screws, and bolts that were used by BAE in performing work under government contracts such as the Mayport MSMO

contract. This scheme resulted from a three-way agreement between Defendant BAE Systems, Defendant XChanging, and Defendant Grainger.

208. In 2011, while Relator was still working for BAE out of BAE's Fairfield, Ohio location, he attended a Director's Meeting in Washington that was also attended by Bob Lazenby, Procurement Director for BAE Systems Indirect Commodity Materials Operations.

209. During this meeting, Mr. Lazenby explained that BAE had recently entered into an arrangement with X-Changing Sourcing Solutions ("Xchanging") whereby Xchanging would negotiate, on behalf of BAE, national contracts for various types of indirect materials.

210. Later, in a separate meeting in Ohio, also in 2011, Mr. Lazenby explained that BAE would receive a rebate from Xchanging at the corporate level as a form of volume discount associated with all contract volume generated by this agreement.

211. In 2012, after Relator had relocated to Mayport, Relator was told not to re-negotiate any of his long-term contracts for maintenance, repair, and overhead items, as BAE would be contracting exclusively with Defendant Grainger for such items in the future.

212. This represented a change from BAE Mayport's practice at the time, which was to purchase its maintenance, repair, and overhead items from various suppliers—including Grainger, but also included other national and regional suppliers.

213. When Relator questioned this decision to obtain all or most of BAE Mayport's maintenance, repair and overhead items from Grainger, he was again told that BAE had an exclusive agreement with Xchanging, and that Grainger was the maintenance, repair, and overhead materials supplier that Xchanging had selected.

214. When Relator checked Grainger's pricing, he found that it was charging 40-50% more than what BAE Mayport was currently paying for many of its indirect materials.

39

215.   Sometime in or around October of 2012, Relator called a meeting with Ed Edminton, a sales representative for Grainger, to discuss pricing and the types of parts that BAE Mayport needed.  During that meeting, Relator explained that he would not switch to Grainger as a supplier for many of the listed items unless Grainger was able to offer more competitive prices. Mr. Edminton responded that he would go back to Grainger and see what he could do.

216.   At a follow-up meeting several weeks later, Mr. Edminton presented pricing information to Relator that was better than what he had previously presented, but still higher than what BAE Mayport was currently paying.  When Relator pointed this fact out to Mr. Edminton, Mr. Edminton responded that the prices were higher due in part to a 35% markup required by XChanging.

217.   In a separate phone call with Patrick Dimond, Senior Corporate Sales Manager at Grainger, Relator again raised questions about Grainger's high prices.  When Relator pressed Mr. Dimond on this point, Mr. Dimond eventually conceded that the costs were higher in part because Grainger had been required to "pay to play"—*i.e.* pay Xchanging in order to have Xchanging select Grainger as the preferred national-level maintenance, repair, and overhead items supplier for BAE Systems.

218.   Given the higher prices and ethical concerns, Relator did not agree to enter into any additional materials contracts with Grainger for BAE Mayport.

219.   After the second meeting with Ed Edminton, Relator complained to Dave Jonis, Relator's direct superior and the Purchasing Manager of BAE's commercial shipyard in Jacksonville, Florida and Vince Stammetti, Director & General Manager for Jacksonville and Mayport Operations and Joseph Kudaschick, Director of Operations for Mayport.  Relator was particularly concerned that if BAE Mayport began ordering these materials from Grainger, then

the upcharge would be passed along to the United States, as BAE Mayport's MSMO contract provided for the reimbursement of such materials as "direct indirect" costs.

220.    In response, Dave Jonis, Vince Stammetti, and Joseph Kudaschick told Relator about the rebate BAE corporate was receiving from XChanging and that working with Grainger was "for the good of the company."

221.    Despite the pressure he received from Dave Jonis, Vince Stammetti, and Joseph Kudaschick, Relator never agreed to order BAE Mayport's indirect materials from Grainger.

222.    Upon information and belief, after Relator was terminated from his position in early 2013, BAE Mayport began ordering its indirect materials from Grainger and passing the XChanging markup along to the United States.

## CAUSES OF ACTION

## COUNT I

**Federal False Claims Act**
**31 U.S.C. §3729 (a)(1)(A) – asserted against Defendants BAE Mayport, BAE Jacksonville, Earl, North Florida Shipyards, and QED Systems**

223.    The Federal False Claims Act, 31 U.S.C. §3729(a)(1)(A), establishes liability for any person who "knowingly presents or causes to be presented a false or fraudulent claim for payment or approval."

**Violations by BAE Mayport together with Earl, North Florida Shipyards, and QED Systems**

224.    BAE Mayport, together with its three favored contractors—Earl, North Florida Shipyards, and QED Systems ("Subcontractor Defendants")—all knowingly presented [in BAE Mayport's case] or knowingly caused to be presented [in the case of the three Subcontractor Defendants] false and fraudulent claims for payment under BAE Mayport's MSMO contract with the United States Navy.

41

225.    Specifically, BAE Mayport and these Subcontractor Defendants knowingly and purposely colluded and shared cost data related to ship repair work to be performed under the MSMO Contract.

226.    Rather than subcontract repair work on a competitive basis, as BAE Mayport was required to do under the express terms of the MSMO contract, BAE Mayport divided significant portions of the MSMO repair work between itself and the three favored Subcontractor Defendants based on preferences expressed during closed-door meetings between these four Defendants.

227.    At various times during the course of his employment, Relator attempted to compete repair work to other companies that he knew were capable of performing the work. However, his managers at BAE Mayport never permitted him to do so.

228.    Relator personally observed BAE Mayport and the Subcontractor Defendants collude in sharing cost data and discussing ship repair work to be done on the USS *Hue City* during a closed-door meeting on March 29, 2012.

229.    Relator also personally uncovered, through a review of earlier repair and maintenance jobs on the *Hue City* from late 2011, that on at least some occasions BAE Mayport subcontracted work to Earl that BAE Mayport could have performed at a lower cost itself.

230.    Relator has personal knowledge of similar collusion that took place in or around December 2011 with respect to repair work for the USS *Hue City*; in or around April 2012 for repair work for the *USS Carney*; and in or around May 2012 for repair work on the USS *The Sullivans*.

231.    Based on information and instructions Relator received from his managers, including Deputy Program Manager Pete Cavasino, Relator knows that such collusion took place

between BAE Mayport and the three Subcontractor Defendants on all or almost all of the ship repair work that BAE was contracted to perform under the MSMO Contract.

232.    Defendant BAE Mayport knowingly submitted false claims for payment to the United States, in the form of fraudulently inflated invoices that the United States reimbursed pursuant to the terms of the MSMO contract.

233.    Defendants Earl Industries, LLC; North Florida Shipyards, Inc.; and QED Systems, Inc.,  all knowingly caused the submission of false and fraudulent claims for payment through the development of inflated cost estimates that they knew BAE Mayport would accept, pay, and submit for reimbursement to the United States.

234.    The claims that BAE Mayport submitted, and that the Subcontractor Defendants caused to be submitted, were false and fraudulent within the meaning of the False Claims Act because they did not comply with material conditions of payment established by the MSMO contract.  Specifically, the MSMO contract incorporated FAR Subpart 31.2 by reference, which states that contractors are only entitled to reimbursement for "reasonable" costs, which are defined as costs that, in nature and amount, do "not exceed that which would be incurred by a prudent person in the conduct of competitive business."  48 C.F.R. §31.201-3(a) (Sept. 2010).

235.    Additionally, FAR subpart 31.2 provides that when a contractor's accounting practices are inconsistent with the FARs' requirements, "costs resulting from such inconsistent practices in excess of the amount that would have resulted from using practices consistent with this subpart are unallowable."  48 C.F.R. §31-201-2(c) (Sept. 2010).

236.    In violation of these material conditions of payment, Defendant BAE Mayport and the Subcontractor Defendants having knowing submitted and/or caused the submission of claims seeking reimbursement for unreasonable, inflated costs.

237.    As a result of the false and fraudulent claims submitted or caused to be submitted by BAE Mayport and the Subcontractor Defendants, the United States has suffered damages and is therefore entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty for each such false or fraudulent claim presented or caused to be presented by the Defendants.

238.    Each false claim submitted or caused to be submitted by BAE Mayport and the Subcontractor Defendants is subject to a penalty of between $5,500 and $11,000.

**Violations by BAE Mayport together with BAE Jacksonville**

239.    In addition to BAE Mayport's bid rigging scheme with the Subcontractor Defendants, BAE Mayport was also knowingly and unlawfully subcontracting work to BAE Jacksonville on a non-competitive basis.

240.    BAE Jacksonville operated the only dry dock in the area, and it was therefore acceptable under the terms of the MSMO contract for BAE Mayport to subcontract dry-dock related work to BAE Jacksonville without competitively bidding the work.

241.    The problem with this relationship was that BAE Mayport was awarding work to BAEJ as a subcontractor at that same time that BAEJ had ultimate operational control over BAE Mayport.

242.    Vince Stammetti was the Director and General Manager for both the Jacksonville and Mayport facilities, and Dave Jonis, Procurement Director for BAE Jacksonville, had oversight authority over Relator in Relator's role as Purchasing Manager for BAE Mayport.

243.    Combined with BAE Mayport's lack of proper estimating procedures, this organizational overlap with BAEJ created a huge conflict of interest and led to a complete lack of cost controls.

244. Additionally, due to the relationship between BAE Mayport and BAEJ, BAE Mayport would often subcontract work unrelated to the actual dry-docking to BAEJ, rather than competing that work.

245. For example, the USS *Carney* was dry-docked in mid-2012 for approximately three months. During that time, BAE Mayport subcontracted many tasks unrelated to the dry-docking to BAEJ that should have been sourced on a competitive basis. Relator knows specifically that BAE Mayport subcontracted the installation of a ballistic missile to BAEJ on a single-source basis that should have been bid competitively.

246. Relator raised these improprieties to his managers—including Vince Stammetti and Dave Jonis—on multiple occasions. Given that Mr. Stammetti and Mr. Jonis had managerial responsibilities for both BAE Mayport and BAE Jacksonville, both entities had knowledge that this non-competitive self-dealing in subcontracting repair work under the MSMO contract was unlawful and was resulting in the submission of fraudulently inflated repair invoices to the United States.

247. As a result of the false and fraudulent claims submitted or caused to be submitted by BAE Mayport and BAE Jacksonville, the United States has suffered damages and is therefore entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty for each such false or fraudulent claim presented or caused to be presented by the Defendants.

248. Each false claim submitted or caused to be submitted by BAE Mayport and the BAE Jacksonville is subject to a penalty of between $5,500 and $11,000.

**Additional Violations by BAE Mayport**

249.    In addition to the collusive schemes to defraud described above, BAE Mayport has also engaged in additional fraudulent schemes involving the knowing submission of false claims for payment to the United States for work performed pursuant to the MSMO contract.

250.    BAE Mayport knowingly violated its obligation under the MSMO contract to verify the eligibility of its subcontractors to work on federal projects, and it subcontracted work to ineligible businesses and then sought reimbursement from the United States.

251.    Despite the clear requirement in the MSMO contract, BAE Mayport never required its subcontractors to make any certifications and never conducted any independent check on whether its subcontractors were debarred, suspended, or proposed for debarment by the federal government.

252.    As early as June 28, 2012, Relator communicated his concerns to Dave Jonis via email that some of the suppliers approved by BAE were not actually approved by the United States.  But Mr. Jonis and the other managers at BAE Mayport ignored Relator's concerns.

253.    The independent audit conducted by Kenwyn Baptiste in May and June of 2012 confirmed Relator's allegations.

254.    For both his audit of material purchase orders and his audit of subcontract purchase orders, Mr. Baptiste found that there were "no reps and certs enclosed" and "no EPLS."

255.    Through internal sweeps and reviews of BAE Mayport's purchasing data, Relator was able to confirm that BAE Mayport actually subcontracted with certain entities who had been debarred or proposed for debarment by the federal government.

256.    BAE Mayport also knowingly overcharged the United States for materials procured without engaging in contractually-required price controls and competitive bargaining.

257.    As with labor costs, the FARs provide that the United States will only pay material costs that are "reasonable . . . in its nature and amount." 48 C.F.R. §31.201-3(a).  The FARs further provide that one important consideration of whether a particular cost is reasonable is if it is based on "[g]enerally accepted sound business practices, arm's length bargaining, and Federal and State laws and regulations."  *Id.*

258.    When Relator took his position at BAE Mayport, he found that the buyers in the materials department were no more willing to bid for materials or manage costs than the subcontract managers and estimators were for repair and maintenance work.

259.    Because BAE Mayport was reimbursed by the United States for its costs, this knowing failure to manage material costs resulted in significant overcharges to the United States.

260.    Relator is aware of numerous specific examples of such overcharging, including without limitation:

a.    A BAE Mayport buyer who regularly placed material orders with a local company called Hagemeyer without ever sending requests for quotes or competitively bidding, in violation of the MSMO contract;

b.    BAE Mayport arbitrarily marking up the price of watertight doors to be installed on USS *The Sullivans* in June and July of 2012;

c.    BAE Mayport placing orders with suppliers and contractors without first obtaining requisitions or purchase orders—in violation of MSMO requirements—and then retroactively creating such documents to create the appearance of compliance with purchasing system requirements.

261.    As a result of the false and fraudulently inflated claims submitted by BAE Mayport, the United States has suffered damages and is therefore entitled to multiple damages

under the False Claims Act, to be determined at trial, plus a civil penalty for each such false or fraudulent claim presented by the BAE Mayport.

262.    Each false claim submitted or caused to be submitted by BAE Mayport is subject to a penalty of between $5,500 and $11,000.

## COUNT II

**Federal False Claims Act**
**31 U.S.C. §3729(a)(1)(B) – asserted against Defendants BAE Mayport and Earl Industries**

263.    Under the express terms of the MSMO contract, BAE Mayport was required to subcontract 40% of its direct costs, minus a few narrowly defined carve outs, to small business concerns.

264.    During the time that Relator worked as its Purchasing Manager, BAE Mayport knowingly made and used false records and statements relating to the amount of its MSMO contract work that BAE Mayport subcontracted to small business concerns.

265.    Specifically, BAE Mayport double-counted work that should only have been counted once and counted Earl Industries as a small business concern after learning that Earl Industries no longer met the applicable definition of a small business concern.

266.    Relator learned of this scheme during the first quarter of 2012, when he and one of his direct reports, Subcontract Administrator Leigh Anderson, were tasked with compiling and analyzing the small business subcontracting numbers that BAE Mayport planned to submit for the Award Fee Board.  The Award Fee Board was the entity responsible for determining whether BAE Mayport was eligible for any completion or performance bonuses under the MSMO.

267.    Ms. Anderson brought it to Relator's attention that BAE Mayport was continuing to identify Earl as a small business concern, despite the fact that it no longer met the regulatory

definition.   Ms. Anderson, with Relator's knowledge, accordingly revised her small business subcontracting numbers to omit subcontract awards to Earl.

268.    Ms. Anderson also brought this issue to the attention of other managers at BAE Mayport, including Dale O'Bar, Director of Contracts.

269.    Director O'Bar demanded that Ms. Anderson put the Earl subcontract awards back into her analysis, which resulted in a significant increase in the percentage of work that BAE Mayport reported to the Fee Award Board as having been subcontracted to small business entities.

270.    Likewise, Earl Industries caused BAE Mayport to make and use false statements and records by insisting that BAE Mayport honor the workshare percentages from the Teaming Agreement even after Earl Industries ceased to be a small business concern.

271.    These false records and statements were material to the United States' decision to pay for work under the MSMO contract that it would not have paid for if it knew that BAE Mayport was not making good faith efforts to comply with the small business subcontracting requirement.

272.    As a result of the false and fraudulent statements and reports made or used or caused to be made or used by BAE Mayport and Earl Industries, the United States has suffered damages and is therefore entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty for each such false or fraudulent claim presented or caused to be presented by the Defendants.

273.    Each false statement or report made, used, or caused to be made or used by BAE Mayport and Earl Industries is subject to a penalty of between $5,500 and $11,000.

## COUNT III

**Conspiracy to Violate the Federal False Claims Act**
**31 U.S.C. §3729 (a)(1)(C) – asserted against Defendants BAE Mayport, Earl, North Florida Shipyards, and QED Systems**

274.    BAE Mayport and the three Subcontractor Defendants—Earl, North Florida Shipyards, and QED Systems—have all conspired to knowingly present false and fraudulent claims to the United States for payment.

275.    Acting under the terms of the work-share targets contained in their Teaming Agreement, BAE Mayport and the Subcontractor Defendants have shared pricing data, colluded on ship repair and maintenance work, and submitted non-competitive subcontracting bids to BAE Mayport that BAE Mayport approved, paid, and invoiced to the United States.

276.    This pattern of collusion and data sharing with respect to ship repair work constitutes clear agreement between the parties to divide ship repair work between them on a non-competitive basis, as well as overt acts in furtherance of the bid-rigging conspiracy.

277.    Relator personally observed BAE Mayport and the Subcontractor Defendants collude in sharing cost data and discussing ship repair work to be done on the USS *Hue City* during a closed-door meeting on March 29, 2012.

278.    Relator also has personal knowledge of similar collusion that took place in or around December 2011 with respect to repair work for the USS *Hue City*; in or around April 2012 for repair work for the *USS Carney*; and in or around May 2012 for repair work on the USS *The Sullivans*.

279.    Based on information and instructions Relator received from his managers, including Deputy Program Manager Pete Cavasino, Relator knows that such collusion took place between BAE Mayport and the Subcontractor Defendants on all or almost all of the ship repair work that BAE was contracted to perform under the MSMO Contract.

280.    As a result of this conspiracy to submit false and fraudulent claims, the United States has suffered damages and is therefore entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty for each such false or fraudulent claim presented or caused to be presented by the Defendants.

281.    Each false claim submitted or caused to be submitted by BAE Mayport and the Subcontractor Defendants is subject to a penalty of between $5,500 and $11,000.

### COUNT IV

**Defendant BAE Mayport's Knowing Retention and Concealment
of Funds Overpaid by the Government
31 U.S.C. §3729(a)(1)(G) – asserted against Defendant BAE Mayport**

282.    At all times relevant to this Complaint, Defendant BAE Mayport received overpayments from the United States—arising from BAE Mayport's claims for payment for unnecessary work and for cost reimbursements over and above the costs that BAE Mayport actually incurred.

283.    Based on its own policies, and from concerns expressed directly by Relator to his managers, Defendant had notice that it was being paid money from the United States that it was not lawfully entitled to receive.

284.    Pursuant to the terms of the MSMO Contract, Defendant BAE Mayport was legally obligated to return these funds that the United States had inadvertently overpaid. Specifically,  BAE Mayport's MSMO contract with the United States specifically incorporated FAR 52-215-10 (Oct. 1997). This regulation, in turn, provides that if a contractor submits inflated costs for reimbursement due to cost or pricing data "that were not complete accurate, and current" or because of "data of any description that were not accurate," then the "price or cost shall be reduced accordingly."

285.     Based on this regulation, which was a term of the MSMO agreement, BAE Mayport knew that it was not entitled to retain overcharges it had submitted for reimbursement to the United States.

286.     In violation of this legal obligation, Defendant knowingly and actively concealed and improperly avoided its obligation to return these overpaid funds.

287.     Such concealment and avoidance included, without limitation:

   a.   Punishing employees for speaking forthrightly to a naval Administrative Contracting Officer;

   b.   Adding fraudulent, retroactive purchase orders to disguise materials and services procured outside of BAE Mayport's normal procurement chain; and

   c.   Submitting falsified data related to BAE's obligation under the MSMO contract to subcontract work to small businesses.

288.     By virtue of this knowing concealment and avoidance, the United States has suffered actual damages.

289.     Defendant BAE Mayport is liable to the United States for treble damages under the FCA, in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each false claim presented or caused to be presented by Defendant.

## COUNT V

**Unlawful Demand for and Payment of Kickbacks,
Resulting in Submission of False Claims and Claims Data in violation of 31 U.S.C.
§3729(a)(1)(A)-(B) – asserted against Defendants BAE Mayport, BAE Systems,
Xchanging, and Grainger**

290.     BAE Mayport's MSMO Contract expressly incorporated FAR 52.203-7 (July 1995) titled, "Anti-Kickback Procedures." That FAR, in turn, incorporated the text of the Anti-Kickback Act of 1986, 41 U.S.C. §§ 51-58, which prohibits any person from "(1) [p]roviding or

attempting to provide or offering to provide any kickback;" or "(2) "[s]oliciting, accepting, or attempting to accept any kickback."

291.   At all times relevant to this Complaint, Defendants BAE Mayport, BAE Systems, Inc., Xchanging, and Grainger pursued a general scheme wherein Grainger paid monetary kickbacks to Xchanging and Xchanging paid monetary kickbacks to BAE Systems to induce BAE systems to order its indirect materials from Grainger.

292.   In exchange, Grainger charged inflated prices for these indirect materials, some portion of which BAE Systems passed along to the United States pursuant to various cost reimbursement contracts between the United States and BAE Systems and its subsidiaries.   One such cost reimbursement contract was the Mayport MSMO contract between Defendant BAE Mayport and the United States Navy.

293.   Defendant BAE Systems, acting directly and through its subsidiaries, has knowingly presented claims for payment to the United States for indirect material costs that BAE Systems knew were fraudulently induced by unlawful kickbacks.

294.   Relator has direct and personal knowledge of this scheme to defraud by Defendants BAE Mayport, BAE Systems, Grainger, and Xchanging.   This personal knowledge is based, without limitation, on:

    a.   Two presentations in 2011 by Bob Lazenby, Procurement Director for BAE Systems Indirect Commodity Materials Operations;

    b.   A meeting in or around October 2012 between Relator and Grainger sales representative Ed Edminton relating to Grainger's products and pricing, and a follow up meeting several weeks later in which Mr. Edminton stated that Grainger's prices were above the market average because they included a 35%

markup required by Xchanging;

 c. A phone call between Relator and Grainger Senior Corporate Sales Manager Patrick Dimond in which Mr. Dimond conceded that Grainger prices were high because it had been required to "pay to play"—i.e. pay Xchanging in order to have Xchanging select Grainger as the preferred national-level maintenance, repair, and overhead items supplier for BAE Systems;

 d. Meetings between Relator and Dave Jonis, the Purchasing Manager of BAE's commercial shipyard in Jacksonville, Florida, and Relator direct superior; Vince Stammetti, Director & General Manager for Jacksonville and Mayport Operations; and Joseph Kudaschick, Director of Operations for Mayport. During these meetings, Jonis, Stammetti, and Kudaschick told Relator about the rebate BAE Mayport was receiving at the corporate level [i.e. BAE Systems] from Xchanging, and that Relator should therefore work with Xchanging's preferred vendor, Grainger, for the "good of the company."

295. By virtue of these false and fraudulent claims, tainted by the unreported kickbacks by Grainger to Xchanging and the corresponding price mark ups that Grainger presented to BAE subsidiaries such as BAE Mayport, and that BAE Mayport paid and then sought reimbursement from the United States, the United States has suffered actual damages.

296. Defendants are jointly and severally liable to the United States for treble damages under the FCA, in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each false claim presented or caused to be presented by Defendants.

## **COUNT VI**

**Retaliation Against Relator for his Efforts
to Stop Defendants from Defrauding the United States
31 U.S.C. §3730(h) – Asserted Against Defendant BAE Mayport**

297.    Chapter 31, Section 3730(h) of the United States Code protects employees, contractors, and agents, from being "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent . . . in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter."

298.    Prior to filing this False Claims Act lawsuit, Relator repeatedly reported on and attempted to stop Defendant BAE Mayport from defrauding the United States.  Specifically, Relator reported Defendant's illegal activities, both verbally and in writing, to Defendant's local management and Defendant's management at its North American Ship Repair headquarters in Norfolk, Virginia.

299.    These internal reports and efforts to stop BAE's fraudulent acts include, without limitation:

a.  Attempting to restructure the BAE Mayport Purchasing Department to establish the oversight and integrity necessary to comply with the MSMO contract and Federal Acquisition Regulations ("FARs");

b.  Arranging for BAE Mayport's corporate parent to conduct an audit of the BAE Mayport purchasing system, in an attempt to shine a light on its unlawful cost estimating and billing practices;

c.  Explicitly telling representatives of BAE Mayport, Earl, North Florida Shipyards, and QED Systems during a meeting on March 29, 2012 that their

practice of sharing cost estimates and dividing ship repair work during closed-door meetings violated the FARs and Program Integrity rules, and objecting to the continuation of this practice;

d.  Objecting to BAE Mayport, Earl, North Florida Shipyards, and QED Systems sharing cost data in a BAE Mayport internal meeting on April 12, 2012, related to the division of repair work for the USS *Carney*;

e.  Objecting, during a May 24, 2012 meeting, to BAE's decision to subcontract significant amounts of repair work on USS *The Sullivans* to Earl, without proper justification for that subcontract;

f.  Communicating to his superior, Dave Jonis, that BAE Mayport needed to update its approved supplier list to conform to the requirements of the United States and ensure that BAE was not subcontracting work to debarred businesses;

g.  Attempting to discipline BAE Mayport employees who were placing material orders without engaging in any competitive pricing, in violation of the MSMO contract requirements;

h.  Refusing to create a falsified, backdated purchase order at the request of Joe Kudaschick; and

i.  Refusing to buy marked up, non-competitively priced supplies from Grainger after being asked to do so by BAE Mayport managers Dave Jonis, Vince Stammetti, and Joseph Kudaschick.

300.   Instead of taking necessary corrective action, Defendant, through the actions of Mr. Stammetti, its General Manager of the Southeast Shipyards in Jacksonville, and David Jonis, its Purchasing Manager for the Southeast Shipyards in Jacksonville, acting in the course and

scope of their employment for Defendant, retaliated against Plaintiff as follows:

a. Systematically stripping Plaintiff of the majority of his duties and responsibilities as Purchasing Manager for Defendant's Mayport Naval Station facility;

b. Excluding Plaintiff from subcontractor and Program Status review meetings;

c. Ordering Plaintiff to keep out of all interactions and procedures involving the issuing of work to suppliers and subcontractors;

d. Humiliating Plaintiff in front of his co-workers in company meetings—including, most egregiously cursing Relator and submitting him to racial epithets at BAE Mayport staff meetings; and

e. Systematically removing and reassigning Plaintiff's support staff.

301.   Plaintiff complained internally about these retaliatory acts, but no corrective action was ever taken.  Instead, on February 14, 2013, Plaintiff, in a meeting attended by Stammetti and others, was told he was being permanently laid off, effective immediately.  In the meeting, Plaintiff inquired if he was going to be given his notice of his rights under the federal Worker Adjustment and Retraining Act ("WARN"), and was told no, that his lay off was to be final and permanent separation.

302.   Plaintiff did not return to work.  However, he learned that on February 14, 2013, Defendant issued WARN notices to all employees who were purportedly to be laid off from Defendant's Mayport Naval Station facility.   As a result of these WARN notices, many employees were able to secure work with Defendant and not be laid off.  On March 6, 2013, Plaintiff also received a notice from Defendant informing him of his WARN rights, and further informing him, erroneously, that his termination would be effective as of May 6, 2013.

303.    After being terminated from his position at BAE Mayport, Relator was not able to secure employment until November of 2014, and that employment was on a contractual basis limited to a short period of time. Moreover, Relator was required to make a weekly commute of several hundred miles.

304.    Defendant is liable to Relator for reinstatement to the same seniority and status he held before his constructive discharge, two times the amount of actual back pay from the date of his constructive discharge, litigation costs, and reasonable attorneys' fees.

## COUNT VII

### Retaliation in Violation of Florida Whistleblower Act
### Fla. Stat. §§448.101, et seq. – Asserted Against Defendant BAE Mayport

305.    The Florida Whistleblower Act states that it is unlawful for an employer, as defined in §448.101(3), to take any retaliatory personnel action against an employee who has objected to or refused to participate in any violation of law and regulation by the employer.

306.    Plaintiff-Relator engaged in protected activity for purposes of §448.102(3) by objecting to the illegal conduct engaged in by BAE Mayport in its false and fraudulent billing of the United States under its MSMO Contract.

307.    For purposes of this count, the protected activity engaged in by Relator is the same as that described in the previous count—and in the body of this complaint—alleging unlawful retaliation in violation of 31 U.S.C. §3730(h).

308.    Defendant BAE Mayport is an "employer" as defined under §448.101(3), Fla. Stat., in that at all relevant times it employed ten (10) or more employees.

309.    Defendant retaliated against Plaintiff-Relator in violation of §448.102(3) by, *inter alia*, stripping Plaintiff-Relator of management and oversight authority and ultimately terminating Plaintiff-Relator's employment.  For purposes of this count, the retaliatory acts

engaged in by Defendant BAE Mayport are the same as those described in the previous count—and in the body of this complaint—alleging unlawful retaliation in violation of 31 U.S.C. §3730(h).

310.    As a direct and proximate result of Defendant's retaliation, Plaintiff-Relator has suffered, and will continue to suffer in the future, damages, including lost back pay and lost benefits, lost front pay, emotional distress, mental anguish, humiliation, loss of dignity, and out-of-pocket expenses.  Plaintiff-Relator is also entitled to recover his reasonable attorney's fees pursuant to §448.104.

## PRAYER FOR RELIEF

WHEREFORE, for the reasons set forth above, Plaintiff-Relator Julio E. Hernandez, on behalf of the United States, respectfully requests that the Court enter an award of judgment against BAE Systems Southeast Shipyards Mayport, LLC; BAE Systems Southeast Shipyards, AMHC, Inc.; BAE Systems, Inc.; Earl Industries, LLC; North Florida Shipyards, Inc.; QED Systems, Inc.; Xchanging, Inc.; and W.W. Grainger, Inc., as follows:

A.    An order requiring Defendants to cease and desist from committing violations of the False Claims Act, 31 U.S.C. §§3729-3733;

B.    An Order entering judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained as a result of its actions, plus a civil penalty against Defendants of $11,000 for each violation of the False Claims Act, pursuant to 31 U.S.C. §3729;

C.    The maximum legal and equitable relief permitted by 31 U.S.C. §3730(h)(2) for Defendant BAE Mayport's retaliatory discharge of Relator;

D.  The maximum legal and equitable relief, including attorneys' fees and expenses, permitted by Fla. Stat. §§448.101, *et seq.*, for Defendant BAE Mayport's retaliatory discharge of Relator;

E.  An order awarding to Relator Hernandez the maximum amount allowed as a "Relator's Share" pursuant to the False Claims Act, 31 U.S.C. §3730(d);

F.  An order awarding to Relator Hernandez from Defendants all reasonable expenses that were necessarily incurred; plus reasonable attorneys' fees and costs, under the False Claims Act, 31 U.S.C. §3730(d); and

G.  An Order awarding to the United States and Relator Hernandez all such other relief as the Court may deem just and proper under federal and Florida law.

## DEMAND FOR JURY TRIAL

Relator Hernandez hereby demands trial by jury as to all issues.

DATED: December 4, 2014

Respectfully submitted,

JERRY E. MARTIN (TN BPR# 20193)
SETH M. HYATT (TN BPR# 31171)
BARRETT JOHNSTON MARTIN
  & GARRISON, LLC
Bank of America Plaza
414 Union Street, Suite 900
Nashville, TN 37219
Telephone:  615/244-2202
615/252-3798 (fax)
jmartin@barrettjohnston.com
shyatt@barrettjohnston.com

JANINE D. ARNO (FL BPR# 41045)
ROBBINS GELLER RUDMAN

& DOWD, LLP
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
jarno@rgrdlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on December 4, 2014, a copy of the foregoing *Second Amended False Claims Act Complaint* was served via certified U.S. Mail, to:

Mr. Gordon A. Jones, Trial Attorney    Mr. Jason Mehta
Fraud Section    Assistant United States Attorney
Commercial Litigation Branch    United States Attorney's Office,
U.S. Department of Justice    Middle District of Florida
P.O. Box 261    300 North Hogan Street, Suite 700
Ben Franklin Station    Jacksonville, FL, 32202
Washington, DC 20044

Because this action is under seal pursuant to 31 U.S.C. §§ 3729-3733, as amended, Defendants have not been served with copies of the foregoing *Second Amended False Claims Act Complaint*.

JERRY E. MARTIN
BARRETT JOHNSTON MARTIN
& GARRISON, LLC